[Crim. No. 14999.    Second Dist., Div. Two.    July 22, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. ALBERT RAYMOND SCOTT, Defendant and Appellant.

Joseph Amato, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Elizabeth Miller, and John C. Hamilton, Deputy Attorneys General, for Plaintiff and Respondent.

HERNDON, J.—After a nonjury trial appellant was found guilty of murder of the first degree and was sentenced to life imprisonment. The victim was Christine Gill Scott, appellant's common law wife and the mother of two daughters fathered by him. ■ On this appeal from the judgment he contends (1) that the evidence is insufficient to sustain the

judgment of conviction because the corpus delicti was not sufficiently established; (2) that a certain sheet which had been torn from a calendar was improperly admitted in evidence for the reason that it was the product of an illegal search. We find no merit in either of these contentions.

Twelve pages of appellant's opening brief and 25 pages of respondent's brief are devoted to detailed statements of the facts as digested from the voluminous record. Our review has satisfied us that the recorded evidence is fairly and accurately summarized in respondent's brief. We hold that the sufficiency of the evidence to establish the corpus delicti is beyond serious question. Indeed, this conclusion is immediately drawn from a reading of appellant's own incomplete version of the evidence. We have given full consideration to the facts emphasized by 'appellant that the body of the victim was never found and that the means used to produce her death were not definitely established.

The applicable law is stated and the controlling precedents are cited in the following quotation from *People* v. *Bolinski,* 260 Cal.App.2d 705, 714-715 [67 Cal.Rptr. 347]:

■ "The corpus delicti of murder consists of two elements: the death of the alleged victim and the existence of some criminal agency as the cause, either or both of which may be proved circumstantially or inferentially. (*People* v. *Jacobson,* 63 Cal.2d 319, 326 [46 Cal.Rptr. 515, 405 P.2d 555]; *People* v. *Amaya,* 40 Cal.2d 70, 75 [251 P.2d 324]; *People* v. *Cullen,* 37 Cal.2d 614, 624 [234 P.2d 1]; *People* v. *Mehaffey,* 32 Cal.2d 535, 545 ·[197 P.2d 12]; *People* v. *Scott,* 176 Cal.App.2d 458, 489 [1 Cal.Rptr. 600]; *People* v. *Ogg,* 159 Cal.App.2d 38, 47 [323 P.2d 117]; *People* v. *Misquez,* 152 Cal.App.2d 471, 477 [313 P.2d 206]; *People* v. *Williams,* 151 Cal.App.2d 173, 177 [311 P.2d 117].) ■ The elements must be established independently of admissions or confessions of the defendant (*People* v. *Amaya, supra; People* v. *Cullen, supra*), but as a basis for introduction of the defendant's confession or admission, the prosecution is not required to establish corpus delicti by proof as clear and convincing as is necessary to establish guilt; a slight or prima facie showing is sufficient. (*People* v. *Mehaffey, supra,* at p. 545; *People* v. *Amaya, supra,* at p. 76; *People* v. *Cullen, supra,* at p. 624.)

■ Once corpus delicti is shown by independent evidence, the degree of the crime not being a part of the corpus delicti, the circumstances of the murder and its degree may be shown by extrajudicial statements of the accused. (*People* v. *Cooper,*

53 Cal.2d 755, 765 [3 Cal.Rptr. 148, 349 P.2d 964] ; *People* v. *Miller,* 37 Cal.2d 801, 806 [236 P.2d 137] ; *People* v. *Williams, supra.)* ▪ It is for the trial court to determine whether a prima facie showing has been made. (*People* v. *Cullen, supra,* at p. 626 ; *People* v. *Scott, supra,* at pp. 464, 489-490.)

▪ "Production of the body of the missing person or of evidence of the means used to produce death are not essential to the establishment of corpus delicti or to sustain a murder conviction. (*People* v. *Cullen, supra,* 37 Cal.2d 614, 624; *People* v. *McMonigle,* 29 Cal.2d 730 [177 P.2d 745] ; *People* v. *Scott,* 176 Cal.App.2d 458 [1 Cal.Rptr. 600] ; *People* v. *Clark,* 70 Cal.App. 531 [233 P. 980].) "

▪ After considering the evidence, the experienced trial judge announced his findings that Christine Scott met her death on March 13, 1965 ; that her death was not the result of natural causes; and that she was the victim of murder. The evidence in this case, considered independently of appellant's extrajudicial admissions and statements, is ample to support the trial court's finding that the elements of the corpus delicti had been proved. This evidence included the testimony of appellant's daughter, Mary Scott, and his stepson, Bobby Gill, with respect to appellant's conduct after the disappearance of their mother. The following is a partial listing of the supporting elements of the evidence :

1. According to the testimony of Bertha and Dora McCarter, her mother and sister, Christine Scott was close to her family. She wrote regularly to her mother and she visited her for a substantial period of time in 1958. Her sister stayed with the Scotts for a month in 1961-62. Her mother stopped receiving letters from Christine after January 1965. Neither the mother nor the sister ever saw or heard from Christine Scott again.

2. Over a period of several years a number of neighbors as well as Dora McCarter had observed Christine's conduct with her children, Mary, Linda and Bobby. She was usually with them and regularly accompanied the girls to and from school. None of her neighbors ever saw or heard from Christine after March 13, 1965.

3. Appellant's and Christine's voices were heard by a neighbor "like you'd hear in arguments." The neighbor thought she heard arguments several times each month.

4. Christine had worked for the witness Wilson from 1964 through the second Saturday in March 1965. She had worked six days a week during that period. As she left Mr. Wilson

that Saturday afternoon at about 2 o'clock, she said, "I'll see you Monday." Mr. Wilson never saw her again.

5. Mary Scott saw her mother go through the back door of their home that Saturday afternoon at about 3 o'clock. Later on, around 3:30, appellant signalled to Mary and Linda and in response they went into the house. There appellant let them play with their mother's makeup, something that Christine had never let them do.

6. Later that night, at about midnight, appellant and Bobby carried a closed cardboard box, 3 feet by 3 feet by 3 and ½ feet in size, from the bedroom of the Scott house to their station wagon. The box was heavy and bulging. According to Bobby, the weight was distributed poorly.

7. Appellant and the children then drove up to the "watering place," an area on Piru Creek, which was located some 50 miles from Los Angeles. There appellant and Bobby carried the box to a spot 30 feet from the creek. With the aid of two shovels they dug a hole approximately 4 feet deep, placed the box in the hole and covered it with dirt, rocks and twigs.

8. A week or so later appellant returned to Piru Creek. On that same weekend appellant sold Christine's clothes, including her favorite red coat, at a "swap meet." Appellant also sold Bobby's .22 calibre rifle, which Bobby had bought approximately two weeks before March 13.

9. A sheet from a March 1965 calendar showing various markings, particularly near the number "13," was found among appellant's personal effects in 1967.

Added to all the other evidence tending to prove the elements of corpus delicti, there is the testimony of appellant himself. ■ As stated in *People* v. *Ditson*, 57 Cal.2d 415, 445-446 [20 Cal.Rptr. 165, 369 P.2d 714] : "It is, of course, elementary and unquestioned that a defendant who chooses to *testify* is just as competent to establish the corpus delicti as any other witness. [Citations.]"

■ Appellant testified in such a manner as to create disbelief in the mind of the most credulous. For example, he testified to a more than dubious story about his burial of the contents of a heavily laden box in preparation for a planned picnic and "dig" for buried Indian relics. This "burial," he said, was conducted on the Tuesday following the Saturday on which Christine, the victim, had disappeared. He went to Piru Creek, the scene of the burial, leaving his home at about 3:30 or 4 a.m. When the prosecutor asked him to describe the

"relics" which he had packed in the box, appellant responded as follows:

"Q. Pardon me, let's go back a little bit. What did you do about preparing the relics to take them up there? A. Well, I selected relics out of my collection. Q. Tell the Court what you took? A. Each—each item? Q. Not every item. Was there any heavy items? A. Oh, yes. Well, it was very heavy. Weighed about a hundred and—a hundred and ten to a hundred and twenty-five pounds. A large damaged corn grinder, which is a solid slab of stone that they grind corn in. That was first. Put that in the bottom, wrapped in newspaper. Then I put small relics. I put small deer horn arrowhead flakers to make arrowheads. I put them in a little bowl portion that was left on the mantle. On top of that was a very large amount of basic relics. Arrowheads, a couple or two or three spears, damaged, and little paint dishes, paint bowls, pastels to mix the paint, and numerous items like that."

Appellant, in the course of his testimony, admitted that Christine departed leaving behind her most of her clothing and that he had sold her clothes at some unspecified time after her disappearance. He admitted also that on the day of Christine's disappearance he had said to their daughter Linda, "Oh, by the way, I've got a big surprise for you," and then gave the two daughters various items of Christine's makeup materials which she had never permitted them to use.

■ "Once prima facie proof of the corpus delicti is made, the extrajudicial statements, admissions, and confessions of a defendant may be considered in determining whether all the elements of the crime have been established." (*People* v. *Duncan,* 51 Cal.2d 523, 528 [334 P.2d 858].)

■ Examples of appellant's various extrajudicial admissions are found in the testimony of appellant's daughter Mary and that of his stepson Bobby. Mary testified that after her mother's disappearance, her father told her that in case anyone should ask "where your Mom was," she should tell them that "she packed up her suitcase and she left and she did not come back." Mary also testified that on the afternoon of the day of the "burial" of the box at Piru Creek, appellant had said to Mary, "I got rid of her." His stepson Bobby testified that on March 13, 1965, appellant told him how he had planned the killing and said that he had shot Christine in the back of the head with Bobby's rifle and that "she dropped like a wet sack." Robert McCarter, Christine's brother, testified that in March or April of 1966, he had told

appellant about some trouble he was having with his wife, saying, "Sometimes I could kill that damn woman," whereupon appellant responded, "If I knew you better, I could *really* tell you something." The witness said that appellant emphasized the word "really." Further discussion of the incriminating evidence, which is overwhelming in its cumulative effect, would be superfluous.

Appellant's second assignment of error is so unsubstantial as to deserve but brief consideration. A few days after he had been taken into custody, appellant wrote a note asking the witness Robert McCarter to take possession of his personal effects. Shortly thereafter McCarter packed up various items of appellant's belongings and took them to his own home. A few days later when appellant's stepson Bobby Gill had come to spend the weekend with the McCarters, Mrs. McCarter suggested that they examine appellant's possessions. Mr. McCarter and Bobby found a piece of paper which appeared to be a sheet from a calendar for the month of March 1965. On this sheet the number "13" was circled in pencil. It was the only number on the sheet which was circled. Pointed down, and toward the top of this circle, was a small arrow, also in pencil. The printed box surrounding the number "13" was also circled, in ink. In this box appeared the following, in pencil: "Chris left us" and below those words "4:00 P.M." Close to and partially beneath the words "Chris left us" appears an extremely light fragment, in pencil, beginning with what appears to be: "Pla . . ." In the box for March 20th, in pencil, appears the following: "water."

This calendar sheet was received in evidence over appellant's objection that it was the product of an illegal search since McCarter was acting as an agent of the police when he found the sheet and turned it over to the authorities. In his *voir dire* examination of the witness, counsel for appellant attempted to establish an agency relationship between McCarter and the police. This attempt failed in that McCarter testified explicitly that he had not acted on the instructions of any police officer. On the contrary, he had acted on the basis of a note addressed to him by appellant and appellant himself admitted that he had, in fact, written such a note to the witness.

Unquestionably the record supports the trial court's conclusion that no agency relationship existed between the discoverers of this item of evidence and any state official. The

record demonstrates that this item of evidence was found by private citizens acting on their own initiative. The ruling of the trial court was correct. (*Burdeau* v. *McDowell,* 256 U.S. 465, 475 [65 L.Ed. 1048, 1051, 41 S.Ct. 574, 13 A.L.R. 1159] ; *People* v. *Botts,* 250 Cal.App.2d 478, 481-483 [58 Cal.Rptr. 412] ; *People* v. *Randazzo,* 220 Cal.App.2d 768, 777 [34 Cal. Rptr. 65].)

The judgment is affirmed.

Roth, P. J., and Wright, J., concurred.