2016 OCT 17 AM 10: 06

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 72068-6-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | PUBLISHED OPINION |
| | ) | |
| BRUCE ALLEN HUMMEL, | ) | |
| | ) | |
| Appellant. | ) | FILED: October 17, 2016 |

SCHINDLER, J. — Following the second trial in this case, a jury convicted Bruce

Allen Hummel of premeditated murder in the first degree of his spouse Alice Kristina

Hummel. Even when viewed in the light most favorable to the State, the evidence does

not support finding the essential element of premeditation beyond a reasonable doubt.

We reverse and vacate the conviction of premeditated murder in the first degree.

Because the prosecutor did not request the court instruct the jury on murder in the

second degree, we must remand to dismiss the conviction with prejudice.

FACTS

Bruce Allen Hummel and Alice Kristina Wehr Hummel married and have three

children, S.C., S.H., and S.K. Hummel and Alice taught school in rural Alaska for a

number of years.[1] Alice suffered from lupus and as a result, in April 1979, she retired

---

[1] We refer to Alice Hummel by her first name for clarity and intend no disrespect by doing so.

from teaching on disability. Alice was entitled to receive disability benefits from the State of Alaska Teachers' Retirement System from April 1979 until she turned 60 and was eligible to receive retirement benefits on February 28, 2004.

Hummel and Alice purchased a house in Bellingham, Washington. Hummel continued to teach school in Alaska. Alice operated a computer business from home. Hummel would spend summers with Alice and the children in Bellingham.

In June 1986, Hummel decided to stop teaching in Alaska. Hummel did construction work in Bellingham. He would also frequently go to remote forest areas to collect cedar and pine cones to sell to a company that made potpourri.

Alice Disappears on October 18, 1990

In 1990, only 17-year-old S.H. and 13-year-old S.K. were living at home. According to S.H., Hummel and Alice "never really got along at that point." S.H. fought with his father "a bit" and "didn't get along all that well" with his mother. According to S.K., there was "constant arguing in the house, but it . . . wasn't always directly between" Hummel and Alice.

In 1990, S.K. had been taking ballet lessons. In October, Alice made plans to attend a ballet performance with S.K. to celebrate her fourteenth birthday on October 21, 1990. S.K. was looking forward to going to the ballet with Alice. A few days before her birthday, S.K. disclosed to Alice that Hummel sexually abused her. S.K. said Hummel had forced her to help him masturbate for years. Alice told S.K. she would "take care of it."

S.K. saw Alice before she left for school on Thursday, October 18. When S.K. returned home from school around 3:30 p.m., Hummel told S.K. that Alice received a

2

telephone call for a job interview in California. When S.H. returned home from school, Hummel told S.H. that Alice "was going off to California for a job interview." S.H. knew Alice was looking for "a job with computers" and "California was the primary area that she was looking" for a job. Alice did not return to attend the ballet with S.K. on her birthday.

One or two weeks later, Hummel told S.H. and S.K. that Alice needed some possessions for her job in California. Hummel asked S.K. to help pack medications, jewelry, and clothing for Alice. While packing, S.K. found Alice's "current purse" and wallet but she did not examine the contents of the wallet. S.H. watched Hummel pack a bag with Alice's needlepoint and a box of software to send to California. Hummel later told S.H., S.K., and their older sister S.C. that Alice got a promotion and moved to Texas.

S.K., S.H., and S.C. never saw or spoke to Alice after October 18, 1990. S.K. received typewritten birthday cards signed by Alice and a letter stating she "met a new guy who didn't like kids." That winter, S.H. received a Christmas card signed by Alice but Hummel signed the check inside. In March 1991, S.C. received an anniversary card signed by Alice. In August, S.C. received a package from Alice for her birthday with a return address in Fort Worth, Texas but with a postal service stamp of "not a valid address."

In spring 1991, S.K. saw the possessions she had packed to send to Alice "in a pile" for a garage sale. S.H. later found the bag with the needlepoint and the box of software in the basement.

Hummel told S.H. that Alice planned to attend his high school graduation in June 1991. But a day or two before the graduation, Hummel said Alice "wasn't going to be able to make it after all." After S.H. graduated, he moved to Nevada. Hummel listed the Bellingham house for sale. Hummel and S.K. moved to Okanogan. Hummel taught school in Okanogan and then moved to Enumclaw to teach school.

Alice often left notes for S.H. in the basement ceiling of the house in Bellingham. While the house was listed for sale, S.H. returned to the house and found a "suicide letter" from Alice in the basement ceiling. S.H. said he was "pretty distraught" when he read the letter "for a number of reasons, but the main one is it was definitely written in my father's handwriting." S.H. did not keep the letter.

S.H. and S.K. tried to locate Alice using "online search databases" and a search service called "1-800 U.S. Search" without success. After Alice's father died in January 1993, S.C. made a "concerted" effort to locate Alice. "I felt that it was important that she know that he had passed away, and there was also an inheritance for her involved." S.C. could not locate Alice.

August 2001 Missing Person Report

S.K. moved to Seattle when she was 17. Sometime around 2000, S.C. and S.K. spent time together. S.K. told S.C. for the first time "about the abuse" and the "anomalies that she noticed at the time of [Alice]'s disappearance." S.C. then talked to S.H. about Alice's disappearance. On August 21, 2001, S.C. filed a missing person report with the Bellingham Police Department.

Bellingham Police Detective Les Gitts and Detective Michael Mozelewski interviewed S.C., S.H., and S.K. and investigated the disappearance. The "only trace"

of Alice that Detective Mozelewski found was a current driver's license from the state of Alaska, deposits of the monthly disability payments from the Alaska Teachers' Retirement System, and withdrawals from a bank account in Alaska. Detective Mozelewski contacted the Federal Bureau of Investigation (FBI) about the deposits and withdrawals from the bank account in Alaska.

Detective Mozelewski obtained a copy of the petition for dissolution that Hummel filed in March 1995 in King County Superior Court but was later dismissed. In the petition, Hummel lists a Dallas, Texas address for Alice. Detective Gitts confirmed the address listed for Alice was "not a valid address."

After Alice disappeared, Hummel did some remodeling at the Bellingham house. On August 18, 2003, the detectives used a ground-penetrating radar instrument to search the Bellingham house and the yard for a body. The search did not reveal any trace of a body. Nor did a later search with cadaver dogs reveal any trace of a body.

April 2004 Interview

The FBI scheduled an interview with Hummel for April 27, 2004 about deposits of the disability checks for Alice and withdrawals of funds from their joint bank account in Alaska. Detective Mozelewski and Detective Gitts went to Billings, Montana to attend the interview. The FBI agent and the detectives met with Hummel at his house in Billings. Hummel admitted the Alaska retirement system continued to deposit disability payments after Alice disappeared in October 1990, and for a period of time, he withdrew money from the account.

Detective Mozelewski and Detective Gitts asked Hummel about Alice's disappearance. Hummel told the detectives that "right around [S.K.]'s birthday" in 1990,

Alice "received a job offer in California. Somebody had sent her up a plane ticket, and she went to California." Hummel said the last time he saw Alice was when he "put her on an airplane in Seattle." Hummel told the detectives Alice moved from California to Dallas and "met another man and wasn't coming back."

Hummel said he met his current spouse while he was teaching in Enumclaw. After they went to Alaska to teach school, Hummel obtained a decree of dissolution from Alice in Alaska. Hummel then married his current spouse and they moved to Billings. Hummel admitted he had "inappropriate contact" with S.K. but said he "rectified that with [her] in a letter," and "his current wife . . . knew what had happened, too."

On May 5, 2004, an FBI agent in Billings contacted Detective Mozelewski about a letter that he obtained that was from Hummel to Detective Gitts. In the 11-page letter, Hummel states Alice committed suicide on October 18, 1990 and he took steps to " 'cover[ ] up her suicide.' "

May 2007 Federal Indictment

In May 2007, a federal grand jury in Alaska indicted Hummel on 12 counts of wire fraud. Hummel pleaded guilty.

In the plea agreement, Hummel states Alice "disappeared" on October 18, 1990 and in May 2004, he "represented that Alice Hummel was deceased, and had been deceased since October 18, 1990." Hummel admits between November 1990 and February 2004, the state of Alaska "deposited approximately $340,032.96 into the Credit Union 1 joint account in the name of, and for the benefit of, Alice K. Hummel;" and he "falsely represented himself to be his deceased wife" so he could continue to collect her disability retirement benefits.

The plea agreement states, in pertinent part:

> Hummel, during the above-mentioned time period, in communications with the State of Alaska Division of Retirement and Benefits, falsely represented himself to be his deceased wife, Alice K. Hummel. The purpose of this deception was to maintain the fiction that his wife was alive in order to continue to collect his deceased wife's disability retirement benefits. The scheme included forging his wife's name as the check payee. During the period alleged in this Indictment, checks written on the Credit Union 1 joint account in Alaska by Hummel were deposited into Hummel's account at the First Interstate Bank in Billings, Montana.

The court sentenced Hummel to a 27-month sentence on each count of wire fraud in violation of 18 U.S.C. § 1343 to be served concurrently.

<u>July 2008 Charge of Premeditated Murder in the First Degree</u>

On July 30, 2008, the State charged Hummel with premediated murder of Alice in the first degree.

> I, DAVID S. MCEACHRAN, Prosecuting Attorney in and for Whatcom County, State of Washington, comes now in the name and by the authority of the State of Washington and by this information do accuse **BRUCE ALLEN HUMMEL** with the crime(s) of **MURDER IN THE FIRST DEGREE**, committed as follows:
>
> then and there being in Whatcom County, Washington,
>
> **MURDER IN THE FIRST DEGREE**
>
> That during the period of time intervening between the 1st day of October, 1990, through the 30th day of October, 1990, said defendant, BRUCE ALLEN HUMMEL, then and there being in said county and state, with a premeditated intent to cause the death of another person, to-wit: Alice Kristina Hummel, caused the death of said person, contrary to Revised Code of Washington 9A.32.030(1)(a), which violation is a Class A Felony; contrary to the form of the Statute in such cases made and provided and against the peace and dignity of the State of Washington.[2]

---

[2] Emphasis in original.

August 2009 First Trial

A number of witnesses testified at the first trial including S.K., S.H., S.C., the detectives, forensic scientists, and jail inmate Donald Cargill. The court admitted into evidence the May 2004 letter Hummel wrote to Detective Gitts and the federal plea agreement to 12 counts of wire fraud.

S.K. testified that when she "finally told her mother about the molestation a few days before her birthday," Alice was " 'upset' " and S.K. "believed her mother would take action."[3] S.K. testified that Hummel continued to molest her after Alice disappeared.

Cargill shared a jail cell with Hummel in the Whatcom County Jail. Cargill testified that Hummel told him "that he had helped his wife Alice 'get to a better place' by mixing a handful of ground up pills in apple cider and giving it to Alice to drink."[4]

The court instructed the jury on murder in the first degree and the lesser included crime of murder in the second degree. The jury convicted Hummel of premeditated murder in the first degree.

First Appeal

In his first appeal, Hummel argued insufficient evidence established the corpus delicti for premeditated murder in the first degree. Specifically, that independent evidence did not establish premeditation. We held the State must prove premeditation beyond a reasonable doubt as an element of the charged crime of murder in the first degree but not to establish the corpus delicti. State v. Hummel, 165 Wn. App. 749, 765, 266 P.3d 269 (2012). "[T]he evidence is sufficient to establish the corpus delicti in a

---

[3] State v. Hummel, 165 Wn. App. 749, 755, 266 P.3d 269 (2012).
[4] Hummel, 165 Wn. App. at 757.

homicide case if it leads to a reasonable and logical inference of death and a causal connection between the death and a criminal act." Hummel, 165 Wn. App. at 766.

Viewed in the light most favorable to the State, because the evidence "leads to a reasonable and logical conclusion that Alice is deceased and that her death was a result of a criminal agency . . . on the part of Hummel," we concluded the evidence established the corpus delicti. Hummel, 165 Wn. App. at 770.

> The evidence that Alice vanished suddenly and surprisingly, never to be heard from again; that she was close with her children and was unlikely to simply abandon them; that, without explanation, she failed to attend a special event for her daughter's birthday; and that the failure to complete a work assignment was out of character leads to a reasonable and logical inference that she is deceased. The evidence that her daughter revealed Hummel's molestation just days before Alice's disappearance, that Hummel continued to molest his daughter after his wife vanished, that he lied to his children about Alice's belonging and whereabouts, that he forged Alice's signature on documents, and that he stole Alice's pension immediately after she vanished leads to a logical and reasonable inference that Alice is dead and that her death is the result of a criminal agency on the part of Hummel.

Hummel, 165 Wn. App. at 770. Nonetheless, because we concluded the court violated Hummel's constitutional right to a public trial, we reversed the conviction and remanded for a new trial. Hummel, 165 Wn. App. at 774.

May 2014 Second Trial

In the second trial, the State called a number of witnesses including S.K., S.H., S.C., the detectives, Alton Terry, forensic scientists, the Whatcom County Medical Examiner, and biomechanics expert Dr. Wilson Hayes. The State did not present the testimony of jail inmate Cargill.

S.K. testified that she "finally told [Alice] what had been happening with the sexual abuse" three to five days before her birthday on October 21, 1990. S.K. said

Hummel "would have me help him masturbate" beginning when she was 3 years old. S.K. said Alice "told me that she was going to take care of it." S.K. said she made the "assumption" that Alice would confront Hummel. But S.K. did not know whether Alice "ever confronted" him. S.K. testified the molestation continued after Alice disappeared, albeit less frequently, until she left home at age 17. S.K. testified that prior to her mother's disappearance, Hummel's behavior "was pretty much how it had been."

Alice did some work for former Seattle Police Department Officer and Private Investigator Alton Terry. Terry testified that about a week before Alice disappeared, he gave her a damaged "floppy disk" and asked her to try to recover the information on the disk. Alice told Terry she would return the disk to him by the "middle of the following week." Terry said Alice always completed work on time but he "[n]ever saw her or heard from her again." After Alice disappeared, Terry tried to locate her using search databases but could not "find any trace" of her.

Detective Mozelewski testified about the April 27, 2004 interview with Hummel in Billings, Montana. Detective Mozelewski said that throughout the interview, Hummel "maintained that he had absolutely nothing to do with" Alice's disappearance. Hummel told the detectives that Alice went to California and then to Dallas for a job.

> The details that [Hummel] gave me were, in fact, [Alice] had gone for the job [in California]. Then she went to some type of computer conference or — and I believe in Dallas, and she received another job there, and then that she had met another man and wasn't coming back.

Hummel "readily admitted" he had inappropriate sexual contact with S.K. between the ages of 3 and 12. Detective Mozelewski testified Hummel did not "indicate whether Alice knew" about the molestation but he told Detective Mozelewski that "if

Alice would have known that, she would have definitely confronted him with it."

> A.    I think [Hummel] said [the molestation] happened more than once, and I think it was, I think his statement was between the ages of three and 12.
>
> Q.    And did he describe what he was doing?
>
> A.    Yes, he did.
>
> Q.    His, in his words?
>
> A.    In his words, he said it was, he would masturbate in front of [S.K.]. Sometimes he would have her assist him in doing that.
>
> Q.    Did you ask him whether or not Alice knew about this?
>
> A.    Yes, I did.
>
> Q.    Did you ask him what response or did he make a comment what response Alice would have had she known?
>
> A.    His response to me was he felt confident that if Alice would have known, she would have confronted him about it.
>
> Q.    Did he indicate whether Alice knew or not?
>
> A.    I don't believe he did.
>
> Q.    Would you check your notes on that and just see? This would be on the interview in Billings.
>
> A.    Yeah, my notes reflect that he told me that he felt that if Alice would have known that, she would have definitely confronted him with it.
>
> Q.    And did the notes indicate whether or not he felt Alice knew?
>
> A.    No, they do not.

The court admitted into evidence the 11-page letter Hummel wrote to Detective Gitts in May 2004. Detective Mozelewski read the letter to the jury. At the beginning of the letter, Hummel states he did not tell the truth during the interview on April 27, 2004. Hummel admits Alice is dead but claims she committed suicide. The letter states, in pertinent part:

> "I apologize for the smokescreen I threw at the three of you, but what else could you expect when it is the same story I've been telling for 13 years? You must admit it sounded rehearsed. Parts of it are true, mostly false."
>
> "What I'm about to write in the best detail is the absolute truth and accurate to the best of my ability considering the amount of time that has passed."
>
> "First fact, Alice Kristine [sic] Wehr Hummel is dead. Second fact, she died of her own hand. Third fact, I covered up her suicide for two reasons, A) On a note I found half laying in the bathroom sink was a request, quote, 'Don't let the kids know,' quote. B) I didn't want [the

Alaska Teachers' Retirement System] to be aware of her death for fear of losing her disability payments."

The letter describes the suicide. Hummel went home around noon on Thursday, October 18, 1990. And as he " 'passed the open bathroom door,' " he " 'found [Alice] laying on her left side with her back to the bathtub. There was a lot of blood in and around the toilet.' " According to Hummel, her " 'left wrist had a terrible gash across it' " and he " 'noticed a note laying mostly down in the sink. Right at the bottom were the words, "Don't tell the kids." ' "

Hummel gives a detailed description of how he cleaned up the blood and disposed of her body. Hummel said he rolled Alice in plastic sheeting, dragged her through the house, and lifted her into the back of his van. The next day on " 'Friday night after the kids were asleep, almost midnight,' " Hummel rowed out to the middle of Bellingham Bay in a makeshift " 'five-man inflatable raft.' " Hummel said the " '[r]owing was very difficult' " and " 'I rowed and bailed for an hour and a half at least, but the wind got worse, and I had to let her body go.' " Hummel states that rowing back " 'was aided by the wind, but finding my way to the marina took a long time.' "

Detective Mozelewski testified that he and Detective Gitts "attempt[ed] to either verify parts of the letter or show that it didn't happen the way that the letter indicated." The detectives obtained a search warrant and returned to the Bellingham house to search for "any residue or residual effects of any blood in the residence" and, in particular, the bathroom. They did not find any trace of blood.

Detective Gitts testified the forensic investigation "revealed essentially no physical evidence" and "[n]othing that was described in the letter was found."

Washington State Patrol Crime Laboratory forensic scientist Alexis Sanzo compared the signatures on the cards and letters that the children received after Alice disappeared with known handwriting samples from Alice and Hummel. Sanzo testified that "although Alice Hummel cannot be identified or excluded as the writer, there are indications she did not write the questioned text. . . . [T]here are indications that [Hummel] wrote the questioned text."

Whatcom County Medical Examiner Dr. Gary Goldfogel testified that if Alice died as Hummel described, she would have lost at least two quarts of blood. Dr. Goldfogel said it is "exceptionally difficult" and "a very rare event" to commit suicide as described by Hummel by cutting the wrist horizontally. Dr. Goldfogel testified that because the two major arteries in the wrist are "quite protected . . . and both are quite deep," a person would "almost have to cut [their] hand off to get deep enough to get at those arteries, and bleeding from the veins and the smaller blood vessels would not allow the blood loss that would be necessary to die." Dr. Goldfogel testified it was also "highly unusual" to not find a body in Bellingham Bay, a "fairly confined body of water." Dr. Goldfogel testified it would be "far more difficult" to discover human remains buried in the forest.

Biomechanics expert Dr. Wilson Hayes testified that assuming Alice "weighed 200 to 250 pounds" and Hummel was 5 feet 10 inches tall and weighed approximately 200 pounds, "Hummel could not, and thus, did not lift his wife into the back of the van." But Dr. Hayes testified that he did not determine whether Hummel could have wrapped the body in plastic and dragged her body out of the house.

> [W]e know from the handwritten note that Mr. Hummel found his,
> according to his description, found his wife on the floor of the bathroom on
> her left side, and that he subsequently wrapped her in a piece of plastic

that he had left over from a job and dragged her essentially through the house out to the van.

I've not looked at the difficulty of that process, of that part of the process. The most difficult part of this was the process of lifting or would have been the process of lifting a deceased body weighing between 200 and 250 pounds up into the van, and so has been the focus of the analysis.

Certified American Sailing Association instructor Tim Ferguson testified that from midnight on October 19, 1990 until noon on October 20, the wind on Bellingham Bay was between three and five knots. Ferguson testified three knots is equal to approximately three and one-half miles per hour. The condition of Bellingham Bay for that time period was "very light air" and "not even to the point of waves." Ferguson testified waves from midnight on October 19 until noon on October 20 "wouldn't be a factor at all" for a person trying to "row a five-man inflatable boat."

Q. Based on your knowledge of the bay and the background that you have and the training that you've had, what would you expect to see on Bellingham Bay with the highest wind speed we had I believe you indicated was 5 knots? What would you expect to see in the bay?

A. At that point, you would have just ripples on the water . . . or small wavelets.

Q. Would they even be called waves at that point?

A. No, it's not even to the point of waves. It's just so little.

. . . .

A. That would be very light air. . . . [W]hen we race out on the bay, if it's not over 4 knots, we don't even start the race, because there's not really enough wind to move the boats around . . . .

Q. Now, if the tide is going in opposition to the wind, is that going to make any difference with winds this light?

A. With winds this light, it would be negligible.

Q. Based on those weather records and your training and experience and your knowledge of the bay, would it be difficult to row a five-man inflatable boat due to wave action at any times that you've described to us on the 19th, late evening, early morning through noon on the 20th of October, 1990?

A. No, as far as wave action is concerned, under those conditions, it wouldn't be a factor at all.

At the conclusion of the State's case in chief, the defense moved to dismiss the charge of premeditated murder in the first degree. The defense argued that unlike in the first trial, the State presented no evidence of premeditation to commit murder.

> Your Honor, at this time, the Defense would move to dismiss the case because the State has not established a prima facie case of murder in the first degree. Pursuant to State v. Green,[5] there is a lack of evidence from which a rational trier of fact could reasonably find beyond a reasonable doubt that the Defendant committed the crime as charged.
>
> What I did, Your Honor, in case you wanted to refer to it, I printed out from the last trial Your Honor's ruling on the half-time motion in the previous trial. Though I know Your Honor is not tied to those specific rulings by any means, I think it's illustrative of what I plan on presenting here which is in the first case, we had Mr. Cargill. Mr. Cargill testified that there was barbiturates in the apple juice slowly administered over time, and that there was a plan to commit murder. We don't have that in this case.
>
> As of right now, there's been absolutely no shred of evidence regarding the premeditation. Without that, I don't think the State has the sufficient evidence for a first degree charge, so I would ask the . . . Court to dismiss this charge.[6]

The prosecutor argued there was sufficient evidence of premeditation based on "the disclosure of the sexual abuse made by [S.K.] to her mother . . . a few days before the mother disappeared;" Hummel's statement that if Alice knew about the molestation, "she would have confronted him;" his admission that Alice died on October 18, 1990; and his plan to fraudulently obtain her disability checks after she died.

> Your Honor, I think it's very clear, and then we have all of the testimony and his admissions, his convictions of 12 counts of wire fraud that related specifically to the thefts of her disability, and he indicated that . . . certainly was one of the motivating factors when he wrote the letter to Detective Gitts, that the financial disclosure was something that he, he indicated at that point, he hid the body and actually got rid of the body, because he did not want to lose that money.
>
> I would submit to you the evidence shows clearly that there is sufficient evidence to go to the jury on premeditation. This was not

---

[5] State v. Green, 94 Wn.2d 216, 616 P.2d 628 (1980).

[6] Emphasis added.

something that was disclosed, and immediately after that, the mother disappeared. There were a number of days, and I would submit that that certainly would establish and gives us the ability to argue premeditation, and there's no contrary evidence, Your Honor.

I would argue that that certainly is sufficient to go to the jury.

Defense counsel argued that even if there were evidence of motive, the evidence did not prove premeditation.

Sufficient evidence of motive, but motive is not an element here. What the State has to prove is premeditation, and that has not been shown. There may have been actions after the fact that she died, but with the State looking at the evidence in the light most favorable to the State, we don't know if there was a confrontation that occurred, and there was no thought, no plan of forethought and an immediate murder occurred. That would be murder II. We don't know if there was an argument, and she had a heart attack; if there was [an] argument, that he struck her down the stairs.

So there's been no evidence of any sort of premeditation, that plan ahead of time that is necessary for a murder I, and so again, please, Your Honor, don't mix up motive with premeditation. I don't think the State has shown that element.[7]

The court denied the motion to dismiss.

The question of whether or not circumstantial evidence is sufficient is of course a question for the jury, but I think if the jury is given evidence that there is a reason to have done this, if the jury is given evidence that there are consequences that would be to Mr. Hummel's benefit as in this case with the receipt of her disability funds over a period of time, there is evidence that there is an event that might be the spur towards making such a plan, that I think can be enough for a jury to consider. It's up to the jury to decide whether that is sufficient for first degree murder for the premeditation.

Certainly, when we talk about instructions, there may be an opportunity for the jury to have a choice to look at a lesser included offense, and we'll talk about that later this afternoon, but I do believe that under the circumstances of this case with the evidence that we have presented to us that the existence of a motive and the opportunity, the children were at school when Ms. Hummel disappeared, Mr. Hummel was not anywhere else, we have no evidence that he was not available, that he has an alibi or anything of that nature, and the circumstances around her disappearance I think can all be taken note of by the jury as sufficient evidence of premeditation, because they have to decide what he was

---

[7] Emphasis added.

thinking, and the only thing they will have to go on that would be how did he act, and so I think it's sufficient for the matter to go to the jury on a charge of first degree murder, and I would deny the motion on that basis.

At the beginning of the trial, the defense had submitted jury instructions on the lesser included crimes of murder in the second degree, manslaughter in the first degree, and manslaughter in the second degree. At the conclusion of the evidence, the defense took the position that if the court refused to instruct the jury on the lesser included crimes of manslaughter, "then we will withdraw our murder II and just go solely on first degree."

The prosecutor argued no evidence supported instructing the jury on the lesser included manslaughter offenses. The prosecutor did not object to the defense withdrawing the jury instructions on murder in the second degree.

> And I don't believe there's any evidence to support manslaughter, and I believe the evidence really is supportive of murder in the first degree, and if the Defense wishes to pull murder in the second degree, that's certainly — the State certain [sic] would not have an objection. I believe that murder in the first degree is what is supported by the evidence.

The court ruled the evidence did not support instructing the jury on the lesser included manslaughter offenses. The court agreed that "if the jury were to find no premeditation, they could easily find" Hummel guilty of murder in the second degree.

> The . . . issue is the premeditation. I understand that, and if that, if the jury were to find no premeditation, they could easily find him guilty of the second degree murder, because they might find everything else without the premeditation, so I understand.
> All right. So the Court will withdraw all — the Defense is withdrawing all . . . lesser included offenses.

The prosecutor did not request the court instruct the jury on murder in the second degree.

17

The court instructed the jury on only premeditated murder in the first degree.

The to-convict jury instruction states:

> To convict the defendant of the crime of murder in the first degree, each of the following elements of the crime must be proved beyond a reasonable doubt:
> (1) During the period of time intervening between the 1st day of October, 1990, through the 30th day of October, 1990, the defendant Bruce Allen Hummel caused the death of Alice Kristina Hummel;
> (2) That the defendant acted with intent to cause the death of Alice Kristina Hummel;
> (3) That the intent to cause the death was premeditated;
> (4) That Alice Kristina Hummel died as a result of the defendant's acts; and
> (5) That the acts occurred in the State of Washington.
> If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.
> On the other hand, if, after weighing all of the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

The jury instruction defining "premeditation" states:

> Premeditated means thought over beforehand. When a person, after any deliberation, forms an intent to take human life, the killing may follow immediately after the formation of the settled purpose and it will still be premeditated. Premeditation must involve more than a moment in point of time. The law requires some time, however long or short, in which a design to kill is deliberately formed.

In closing argument, the prosecutor asserted the evidence established "[t]he motive is very clear" and shows Alice confronted Hummel and he killed her "so that [he] would not be exposed, and then he continued to take the money and perpetrated this huge fraud against the Teachers' Retirement System . . . as part of a very elaborate scheme."

> [Alice] was dead on October 18th at the hand of this Defendant because of the molestation that was raised by Alice to the Defendant, and she told [S.K.] what she was going to do — I will take care of this, and I would submit to you the evidence . . . shows, clearly, the Defendant took care of

her, and he killed her, and he did that so that [he] would not be exposed, and then he continued to take the money and perpetrated this huge fraud against the Teachers' Retirement System, and it was all done as part of a very elaborate scheme that he had, and it got more and more elaborate, and he told various stories. I would ask you to take a look very carefully because those, all of the stories he tells are circumstantial evidence of exactly what he did.

The motive is very, very clear. The motive is very clear here. We have the two things, the molestation, and we've got the theft, and those things are very clear, and when you look at all of the facts, you can see what he did.

In addressing the element of premeditation, the prosecutor argued the evidence established premeditated intent because Hummel got "rid of the body. . . . [H]e had time and did think about it. All we need is one moment more than one point in time. No question premeditation has been proven."

That brings us right back to the elements, instruction No. 12. Now this, the case begins and it ends on these elements. That's what this case is about. That's a burden that I have as a representative of the state representing the people. I have to prove these elements beyond a reasonable doubt. We don't have to have a body. I don't have to show you a manner and means. I have to show you that he killed Alice Kristina Hummel, and ladies and gentlemen, the evidence just cries out that he did that.

It's very clear he did that, and it's very clear why he did that. It's clear he acted with intent to cause her death, and it's clear that the death was premeditated. He was able to get rid of the body. He had to go somewhere to do that. I would submit to you the evidence is very clear that he had time and did think about it. All we need is one moment more than one point in time. No question premeditation has been proven.[8]

Defense counsel argued there was no evidence Alice confronted Hummel about S.K.'s disclosure of molestation.

The why, the State has based their case on the molestation, but no one can tell you if he was actually confronted. [S.K.] says the disclosure happened three to five days before mom disappeared. Though at one point, she was saying it was more like a week and a half, but say it's three days. We know that mom didn't do anything that we would expect a mom

---

[8] Emphasis added.

19

to do. Didn't call law enforcement. Didn't call the pastor. Didn't even get her out of the house. Didn't even contact Wayne Terry, who we'll go into a little bit more detail with this. This is the neighbor who they were using to, he was using Alice to do some computer work. He's law enforcement. He's now in the ministry. She didn't talk to him about it.

The defense argued there was no evidence of premeditation.

[T]he real element is premeditation. That's first degree murder. That's what is so different in this case. Premeditation. Premeditation, you have the instruction, but you can see that it requires a thought over — beforehand, some deliberation, formation of a settled purpose, more than a moment in time, some time, however long or short which the design to kill is formed. . . .
    When we're talking about premeditation, there's no evidence of this; that Mr. Hummel made a plan before she died. Again, she could have had a heart attack. She could have been pushed down the stairs, but there's no shred of evidence regarding this settled purpose.
    What you would want to see, right, is some sort of, I don't know, hired a contract killer, went and bought a gun, bought a shovel, bought plastic sheeting, got some poison, drugged her in her sleep, something that shows you it's a difference of premeditated murder versus murder.
    So the defense can only assume, because again, we're speculating a lot. There's probably two theories regarding this molestation, how it could have occurred. [S.K.] tells mom I'm being abused. Mom waits several days, because we know there's a time period, confronts [Hummel] on the day she disappears. Let's assume this. [Hummel] in a rage kills her right then and there, and when the kids come home, mom is gone.
    If that is the way it happened, that's murder in the second degree, because there's no premeditation. So if you think he was confronted, and he responded with killing her, under the Judge's instructions, you have to say not guilty today. We're not determining lessors, just premeditated murder.

In rebuttal, the prosecutor argued the evidence showed Alice confronted Hummel about the molestation and he killed her with premeditated intent.

[W]hen that confrontation occurred [Hummel] said I'm going to kill her, and then he killed her, and that would be premeditation, however long or short. Well, ladies and gentlemen, I would submit the evidence is clear that's exactly what happened in this case.

The jury convicted Hummel as charged of premeditated murder in the first degree.

ANALYSIS

Hummel contends insufficient evidence supports the conviction of murder in the first degree. Hummel asserts the State did not prove beyond a reasonable doubt the essential element of premeditation.

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); U.S. CONST. amend. XIV; WASH. CONST. art. I, § 3.

> [A]n essential of the due process guaranteed by the Fourteenth Amendment [is] that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof—defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense.

Jackson v. Virginia, 443 U.S. 307, 316, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); accord State v. Green, 94 Wn.2d 216, 221, 616 P.2d 628 (1980).

"The sufficiency of the evidence is a question of constitutional law that we review de novo." State v. Rich, 184 Wn.2d 897, 903, 365 P.3d 746 (2016). The critical inquiry on review of the sufficiency of the evidence to support a criminal conviction is to "determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 318.

This inquiry impinges on the discretion of the fact finder "to the extent necessary to guarantee the fundamental protection of due process of law" and focuses on "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a

21

reasonable doubt." Jackson, 443 U.S. at 319;[9] Green, 94 Wn.2d at 221-22; State v. Gentry, 125 Wn.2d 570, 596-97, 888 P.2d 1105 (1995); Rich, 184 Wn.2d at 903. Where sufficient evidence does not support a conviction, such a conviction "cannot constitutionally stand." Jackson, 443 U.S. at 317-18.

The determination of whether the evidence, so viewed, is adequate to allow "any rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt" guards against a conviction where "no rational trier of fact could find guilt beyond a reasonable doubt." Jackson, 443 U.S. at 319, 317.[10]

> The Winship doctrine requires more than simply a trial ritual. A doctrine establishing so fundamental a substantive constitutional standard must also require that the factfinder will rationally apply that standard to the facts in evidence. A "reasonable doubt," at a minimum, is one based upon "reason." Yet a properly instructed jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt, and the same may be said of a trial judge sitting as a jury. In a federal trial, such an occurrence has traditionally been deemed to require reversal of the conviction. Glasser v. United States, 315 U.S. 60, 80[, 62 S. Ct. 457, 86 L. Ed. 680 (1942)]; Bronston v. United States, 409 U.S. 352[, 93 S. Ct. 595, 34 L. Ed. 2d 568 (1973)]. See also, e.g., Curley v. United States, 81 U.S. App. D.C. 389, 392-393, 160 F.2d 229, 232-233 [(1947)]. Under Winship, which established proof beyond a reasonable doubt as an essential of Fourteenth Amendment due process, it follows that when such a conviction occurs in a state trial, it cannot constitutionally stand.

Jackson, 443 U.S. at 316-318.[11]

The legal determination of the sufficiency of the evidence "essentially addresses whether 'the government's case was so lacking that it should not have even been submitted to the jury.' " Musacchio v. United States, ___ U.S. ___, 136 S. Ct. 709, 715, 193 L. Ed. 2d 639 (2016) (quoting Burks v. United States, 437 U.S. 1, 16, 98 S. Ct.

---

[9] Emphasis in original.
[10] Emphasis in original.
[11] Footnotes omitted.

2141, 57 L. Ed. 2d 1 (1978)). This "limited review does not intrude on the jury's role 'to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.' " Musacchio, 136 S. Ct. at 715 (quoting Jackson, 443 U.S. at 319).

To convict Hummel of murder in the first degree as charged, the State had the burden of proving beyond a reasonable doubt that Hummel acted with premeditated intent to cause the death of Alice. RCW 9A.32.030(1)(a) (A person is guilty of murder in the first degree when "[w]ith a premeditated intent to cause the death of another person, he or she causes the death of such person."). The essential element of premeditation differentiates murder in the first degree from murder in the second degree. State v. Bingham, 105 Wn.2d 820, 823, 719 P.2d 109 (1986); State v. Hoffman, 116 Wn.2d 51, 82, 804 P.2d 577 (1991); RCW 9A.32.050(1)(a) (A person is guilty of murder in the second degree when "[w]ith intent to cause the death of another person but without premeditation, he or she causes the death of such person.").

As defined by the legislature, premeditation must "involve more than a moment in point of time." RCW 9A.32.020(1). The "mere opportunity to deliberate is not sufficient to support a finding of premeditation." State v. Pirtle, 127 Wn.2d 628, 644, 904 P.2d 245 (1995); Bingham, 105 Wn.2d at 827 ("The opportunity to deliberate is not sufficient."). To establish premeditation, the State must show "the deliberate formation of and reflection upon the intent to take a human life and involves the mental process of thinking beforehand, deliberation, reflection, weighing or reasoning for a period of time, however short." Hoffman, 116 Wn.2d at 82-83; Gentry, 125 Wn.2d at 597-98.

23

Viewing the evidence in the light most favorable to the State, evidence supports the jury finding Hummel killed Alice. Alice made plans to go to the ballet with S.K. to celebrate S.K.'s birthday on October 21, 1990. But Alice disappeared on October 18, a few days after S.K. disclosed to Alice that Hummel had been sexually molesting her for years. Alice always completed work projects on time and she told Terry she would complete a work project for him that week. No one ever saw or spoke to Alice after she disappeared on October 18. Hummel admitted Alice died on October 18 but lied to S.K., S.H., and S.C. Hummel told S.K., S.H., and S.C. that Alice went to California and later to Dallas for a job. Hummel wrote cards and letters to S.K., S.H., and S.C. from Alice. In the May 2004 letter to Detective Gitts, Hummel states Alice committed suicide and describes the steps he took to dispose of her body after she died. The evidence at trial established Alice did not commit suicide and Hummel could not have disposed of her body in the manner he describes. In the 2007 federal plea agreement, Hummel admits that beginning in November 1990 until February 2004, he fraudulently obtained the disability payments for Alice that were deposited in the joint account in Alaska.

By contrast, the evidence does not support finding premeditation beyond a reasonable doubt. The State can prove premeditation by circumstantial evidence "where the inferences drawn by the jury are reasonable and the evidence supporting the jury's finding is substantial." Pirtle, 127 Wn.2d at 643; Gentry, 125 Wn.2d at 598; State v. Finch, 137 Wn.2d 792, 831, 975 P.2d 967 (1999). In Pirtle, the Washington Supreme Court identified four characteristics or factors that are "particularly relevant to establish premeditation: motive, procurement of a weapon, stealth, and the method of killing." Pirtle, 127 Wn.2d at 644. The court states two of the factors, procurement of a weapon

and stealth, "can be further combined as evidence of planning." Pirtle, 127 Wn.2d at 644.

Unlike the first trial, the State presented no evidence of planning or method of killing. In the first trial, jail inmate Cargill testified that Hummel admitted giving Alice barbiturates to kill her. And despite concerted efforts, the police never found her body.

The State argues the evidence establishes Alice confronted Hummel and he had a strong motive to kill her. The State points to the evidence that three to five days before Alice disappeared on October 18, 1990, S.K. disclosed to Alice that Hummel had been molesting her for a number of years and the testimony that Alice told S.K. she would "take care of it." The State also points to the evidence that during the interview with the detectives in April 2004, Hummel said if Alice knew he had been molesting S.K., Alice "would have definitely confronted him with it." The State also points to the evidence that Hummel admitted Alice died on October 18, 1990; he disposed of her body; and he fraudulently obtained her disability checks from November 1990 until February 2004.

The State claims the jury could infer that after Alice confronted Hummel, he formed the intent to kill her. But there is no evidence to show that Hummel knew that in October 1990, S.K. disclosed to Alice that he had been molesting S.K. or that Alice ever confronted Hummel. No witness testified that Hummel knew in October 1990 that S.K. told Alice about the molestation. And no witness testified that Alice confronted Hummel about the molestation. S.K. testified she assumed but did not know whether Alice "ever confronted" Hummel. Detective Mozelewski testified that during the interview in 2004, Hummel did not indicate that he was aware Alice knew about the molestation of S.K.

25

And Hummel's statement to Detective Mozelewski that "if Alice would have known, she would have confronted him about it," does not create a reasonable inference that she in fact did confront him.

Further, even if the evidence supports a reasonable inference that a confrontation occurred, there is no evidence to show deliberation or reflection before Hummel killed Alice. The evidence that Hummel disposed of her body, concealed her death, and fraudulently obtained her disability checks after she died is evidence of guilt but does not prove premeditation. See State v. Etheridge, 74 Wn.2d 102, 113, 443 P.2d 536 (1968). Inferences based on circumstantial evidence must be reasonable and "cannot be based on speculation." State v. Vasquez, 178 Wn.2d 1, 16, 309 P.3d 318 (2013); see also Jackson, 443 U.S. at 319 (the trier of fact may draw only reasonable inferences); United States v. Nevils, 598 F.3d 1158, 1167 (9th Cir. 2010) ("[E]vidence is insufficient to support a verdict where mere speculation, rather than reasonable inference, supports the government's case . . . or where there is a 'total failure of proof of [a] requisite' element.")[12] (quoting Briceno v. Scribner, 555 F.3d 1069, 1079 (9th Cir. 2009)).

The two cases the State relies on, State v. Ollens, 107 Wn.2d 848, 733 P.2d 984 (1987), and State v. Neslund, 50 Wn. App. 531, 749 P.2d 725 (1988), do not support the argument that the evidence in this case supports a reasonable inference of premeditation.

In Ollens, in addition to motive, the evidence established the defendant procured a knife, struck the victim from behind, stabbed the victim numerous times, and slashed

---

[12] Third alteration in original.

the victim's throat. Ollens, 107 Wn.2d at 853. The court held that based on the evidence, the jury "would not be left to speculate or surmise only as to the existence of premeditation." Ollens, 107 Wn.2d at 853.

In Neslund, in addition to motive, the evidence showed the defendant made previous threats to " 'waste' " her husband, he was afraid of the defendant and "feared for his life," the defendant obtained a gun beforehand, and her brother restrained her husband while she went to get the gun and then shot and killed him. Neslund, 50 Wn. App. at 559-60. The court held the evidence "indicates deliberation and premeditation." Neslund, 50 Wn. App. at 560.

Unlike Ollens and Neslund, the State presented no evidence of motive, planning, the circumstances or the method and manner of death, or the deliberate formation of the intent to kill Alice beforehand.

For the first time on appeal, the State claims the testimony of biomechanics expert Dr. Hayes creates a reasonable inference that "Hummel lured Alice out of the home prior to killing her." The State asserts that because Hummel could not have moved her body, he "used a method that required a plan" to "lure" Alice out of the house before killing her. The argument is speculative and misstates the testimony of Dr. Hayes. Dr. Hayes did not testify that Hummel could not move the body. Dr. Hayes testified that Hummel "did not lift his wife into the back of the van." Dr. Hayes states he did not consider whether Hummel could have wrapped Alice's body in plastic and

dragged her out of the house.[13]

At oral argument, the State asserted this case is similar to People v. Scott, 274 Cal. App. 2d 905, 79 Cal. Rptr. 587 (1969). We disagree. In Scott, the defendant's stepson testified the defendant "told him how he had planned the killing and said that he had shot [the victim] in the back of the head with [the stepson]'s rifle." Scott, 274 Cal. App. 2d at 910. There was no challenge to the sufficiency of the evidence of premeditation. On appeal, the court addressed whether the State established the corpus delicti of the crime of murder in the first degree. Scott, 274 Cal. App. 2d at 906-08. The court concluded independent evidence established the corpus delicti. Scott, 274 Cal. App. 2d at 907-08.

Viewing the evidence in this case in the light most favorable to the State, we conclude no reasonable trier of fact could have found beyond a reasonable doubt that Hummel killed Alice with premeditated intent to commit murder in the first degree.

Reversal for insufficient evidence is "equivalent to an acquittal" and bars retrial for the same offense. State v. Wright, 165 Wn.2d 783, 792, 203 P.3d 1027 (2009). "The Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding." Burks, 437 U.S. at 11.

Because the prosecutor did not request the court instruct the jury on the lesser included crime of murder in the second degree, we cannot remand to enter a judgment

---

[13] We note the State cites no case and through independent research we have found no case where motive alone supports a jury finding of premeditation. See, e.g., Finch, 137 Wn.2d at 792; Pirtle, 127 Wn.2d at 644-45; Gentry, 125 Wn.2d at 600-01; Hoffman, 116 Wn.2d at 83-84; State v. Howard, 182 Wn. App. 91, 104, 328 P.3d 969 (2014); State v. Cortes Aguilar, 176 Wn. App. 264, 273-74, 308 P.3d 778 (2013).

on murder in the second degree.  <u>In re Pers. Restraint of Heidari</u>, 174 Wn.2d 288, 293-94, 274 P.3d 366 (2012).

     We reverse, vacate the conviction for premeditated murder in the first degree, and remand to dismiss the conviction with prejudice.


WE CONCUR: