[No. 12710–1–I.   Division One.   July 23, 1984.]

THE STATE OF WASHINGTON, *Respondent,* v. RONALD
MARTIN REID, *Appellant.*

*Randy Barnard,* for appellant (appointed counsel for appeal).

*Norm Maleng, Prosecuting Attorney,* and *Ruth A. Robinson, Deputy,* for respondent.

SWANSON, J.—Ronald Reid, a/k/a Roybal, was convicted by a jury of first degree murder while armed with a deadly weapon and a firearm. He appeals seeking a reversal of his conviction on the sole basis that the trial court erroneously denied his motion to suppress certain physical evidence obtained during a search of his residence. We affirm.

On the evening of September 1, 1978, a man was shot to death in a parking lot of a south end Seattle tavern. Two eyewitnesses told the police that from across the street they observed a green car with black racing stripes down the side parked next to the tavern. It was facing them and it was in their lane. Its engine was idling and its lights were off. As they drove across the street to suggest that the driver, a "Mexican–looking" man with dark hair and a mustache, turn on his lights, they saw a "Mexican–looking" woman

and the victim, a tall, blond man, exit the tavern and walk toward the parked car. Just as they drove beside the passenger side of the parked car, they saw the woman step away from the victim and saw and heard a single shotgun blast come from the parked car. The victim dropped to the ground and the woman ran to the parked car, got in, and they drove away. The police learned from the bartender of the tavern, who identified the suspects at a lineup and at trial, that the "Mexican–looking" woman, later identified as the defendant's wife, had been attempting to lure the victim outside of the tavern and earlier had told her husband, the defendant, to get the shotgun ready.

That evening, the police also learned that the "Mexican-looking" couple had lived and worked at the Lin Villa Motel. The police went to the motel and were given the suspects' names, Harold and Crucita Roybal (Reid), and their home address.

Just before 10 a.m. the next morning, the police arrived at the Reids' address and saw a green car closely matching the description of the getaway vehicle parked in front of a large, apartment type building.[1] Because the police were uncertain which door led to the Reids' residence, they staked out the car. A short time later, the defendant emerged from the building and got into the green car, but before he could drive away, the police stopped, arrested, handcuffed, and placed him in the patrol car.[2] The police were still uncertain as to which apartment the defendant had exited and uncertain as to whether the several apartment units had a common entry. After the defendant refused to dispel these uncertainties and refused to tell the

---

[1] Officer Marberg described the building as "a large building, house, that was located on the northeast corner of 25th Avenue South and South Holgate. We had no idea whether there was a—this building contained one or more apartments."

[2] The evidence suggests that the car was not lawfully parked. Officer Marberg testified: "then Mr. Roybal or Mr. Reid came out of the green building. . . . but came out from the direction of the building and got into the car and started to drive off, and patrol units surrounded the car as it entered the street's surface of South Holgate and stopped him."

police where his wife was or in which apartment unit he resided, the police went to the defendant's car and removed the ignition keys which were attached to what appeared to be residence keys.

The police testified that at that time they fully expected the defendant's wife to be within the apartment. They thought she had probably witnessed her husband's arrest and may have had the shotgun. They knew she had been involved in a shooting, and they, therefore, believed they were in physical danger. Additionally, the police stated that the building was difficult to secure without placing police officers in further peril.

The police then went to one of the doors of the residence which several neighbors had identified as the door from which the defendant had exited and tried one of the keys. As the door opened, the police identified themselves, entered, and demanded that anyone within come out. After entering, the police were still uncertain as to whether they had entered a single residence or a common hallway. They continued to announce their presence as they entered, but no one responded. While looking for the defendant's wife, whom they found hiding behind a door, they noticed, but did not seize, a box of ammunition on the table. The police arrested the defendant's wife and charged both the defendant and his wife with first degree murder.

The police then secured the apartment and impounded the car.[3] Later, while searching the residence under authority of a warrant, the police found two Polaroid photographs (one depicting the defendant's wife holding a sawed–off shotgun), a pillowcase, and two 20–gauge shotgun shells.

On the morning after the shooting, a man named Murphy, while jogging in Seward Park, discovered a pillowcase containing a shotgun which experts later testified had been

---

[3]Contrary to the police officers' first impression of an apartment building, it turns out that the building contained only two residences. As an officer who was on the scene testified: "By that time we had determined that that building contained two separate residences, one upstairs and then one downstairs on the bottom portion. The Roybals had been in the downstairs portion."

recently fired. Additionally, the neighbor in the upstairs apartment told the police that 2 or 3 weeks before the shooting Reid had tried to sell him a shotgun which looked very similar, if not identical, to the shotgun Murphy had recovered and given to the police.

At trial the defense moved to suppress the physical evidence obtained during the execution of the search warrant arguing that the evidence was the fruit of the illegal seizure of the car keys and that the police violated the "knock and announce" rule. The trial court denied the motion, but subsequently, at a hearing on a motion in limine, reversed that decision with respect to the two photographs. Nevertheless, at the trial the State offered into evidence the photograph of the defendant's wife holding a sawed-off shotgun. The defense only objected to its admission on the basis of insufficient foundation. Having found a sufficient foundation, the trial court admitted the photograph.

Reid now appeals, contending that (1) the seizure of the physical evidence was the fruit of an unconstitutional warrantless seizure of his keys; (2) the warrantless arrest of his wife in their home amounted to a violation of his constitutional rights; (3) the police violated the "knock and announce" rule; (4) the search was conducted pursuant to a "general" warrant violative of the Fourth Amendment; and (5) the warrant did not authorize the seizure of the photographs.

The State contends that the warrantless entry into Reid's car and the warrantless seizure of the keys were justified as incident to a lawful arrest, by exigent circumstances, by hot pursuit, and because the keys were in plain view. Only two of these exceptions to the warrant requirement, incident to a lawful arrest and exigent circumstances, arguably apply under the facts of this case.[4]

---

[4]Hot pursuit, like danger to the public and police, is merely one type of exigent circumstance. *State v. Counts,* 99 Wn.2d 54, 60, 659 P.2d 1087 (1983). Because the police observed the keys from a nonprotected area, a public street, the "open view doctrine," not the "plain view doctrine," applies. *See State v. Seagull,* 95 Wn.2d 898, 901–02, 632 P.2d 44 (1981). Under this rule, entry into a

▮▮ The Fourth Amendment provides no barrier to the seizure of the keys under these facts, notwithstanding the fact that the police placed Reid in the patrol car before seizing the keys. *New York v. Belton,* 453 U.S. 454, 69 L. Ed. 2d 768, 101 S. Ct. 2860 (1981). Thus, the crucial inquiry is whether the seizure was permissible under article 1, section 7 of the Washington Constitution. In *State v. Ringer,* 100 Wn.2d 686, 674 P.2d 1240 (1983), our State Supreme Court concluded that this section of our state constitution "poses an almost absolute bar to warrantless arrests, searches, and seizures, with only limited exceptions . . ." *Ringer,* at 690. Those exceptions include exigent circumstances and searches incident to lawful arrests.

We find the seizure of the keys not to have been barred by our state constitution. First, the seizure of the keys, innocuous in themselves, unlike the seizure of illicit drugs in *Ringer,* was a reasonable intrusion limited in scope to the extent necessary to secure the automobile. Second, although there existed probable cause to obtain a warrant to search the car, one could not have been obtained with the celerity demanded by the circumstances, notwithstanding the telephonic warrant provisions of CrR 2.3(c), because (1) Mrs. Reid had not been arrested; (2) the police thought that she had probably witnessed the arrest of her husband; (3) the shotgun had not been surrendered; (4) she had been involved in a shooting less than 24 hours earlier; (5) the physical surroundings made it difficult to secure the premises and, therefore, difficult to insure the arrest of Mrs. Reid; and (6) a forewarned suspect could more easily and readily secrete or destroy the murder weapon.

▮ Even if we assume that the seizure of the keys was unconstitutional, we conclude that the causal link between the seizure of the keys and the seizure of the photographs and shotgun shells was so attenuated that the taint of the seizure of the keys had dissipated. The record clearly

---

protected area, the car, to seize the keys must be justified by exigent circumstances. 1 W. LaFave, *Search and Seizure* § 2.2, at 242–43 (1978).

reveals that bystanders had identified the door through which the defendant had often entered and exited. The keys were not utilized in the manner of a divining rod to locate the Reids' apartment but rather to facilitate access to their residence[5] and to confirm from which door the defendant had exited. Consequently, the suppression of the photographs and shotgun shells was not required by the "fruit of the poisonous tree" doctrine. *See Nardone v. United States,* 308 U.S. 338, 341, 84 L. Ed. 307, 60 S. Ct. 266 (1939).[6]

Reid next contends that the police, by entering his residence without a warrant to arrest his wife, violated both the state and federal constitutions. First, he attempts to assert the rights afforded an arrestee by *Payton v. New York,* 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371 (1980); second, he asserts that the police violated the "knock and announce" rule, as codified in RCW 10.31.040. Both are premised upon an asserted reasonable expectation of privacy in the apartment.

Initially, we find Reid lacks standing to assert any rights his wife may have had under *Payton v. New York, supra.* On the other hand, we believe he does have a basis upon which to assert that the warrantless arrest of his wife, while in their temporary residence, amounted to a warrantless search. We find, however, that this warrantless search was not violative of either the state or federal constitutions.

If the exigencies permit, the police may, without a warrant, enter a home to arrest a person, *Payton v. New*

---

[5]If the entry was otherwise constitutionally permissible, the police would have been justified in making a forced entry. *See* RCW 10.31.040.

[6]The State has not argued on appeal, nor did it attempt to prove at trial, that the challenged evidence would inevitably have been discovered, absent the challenged police actions. Nevertheless, based upon the uncontroverted evidence in the record, the evidence would inevitably have been discovered absent the asserted illegal police conduct. Accordingly, suppression was not required even if the evidence was otherwise tainted by illegality. *Nix v. Williams,* ___ U.S. ___, 81 L. Ed. 2d 377, 104 S. Ct. 2501 (1984); *State v. Broadnax,* 98 Wn.2d 289, 308, 654 P.2d 96 (1982) (Dolliver, J., dissenting).

*York, supra,* or to seize evidence which may be destroyed before a warrant could be obtained. *Ringer.* The particular facts of this case are laden with exigencies that would have supported a warrantless entry. First, there was a genuine concern for police and public safety based upon their belief that Mrs. Reid had witnessed her husband's arrest from the apartment and that the shotgun had not been recovered, and their knowledge that she had been involved in a shotgun murder. Second, as discussed above, these circumstances did not permit the delay necessary to obtain a warrant. Consequently, the lack of a warrant was no constitutional barrier to the police entry into the residence.

■■ The second analytical step requires inquiry into whether the police properly announced their presence and purpose before entering the apartment.[7] *Ker v. California,* 374 U.S. 23, 37, 10 L. Ed. 2d 726, 83 S. Ct. 1623 (1963); *State v. Coyle,* 95 Wn.2d 1, 621 P.2d 1256 (1980). This rule has been codified in RCW 10.31.040 which provides:

> To make an arrest in criminal actions, the officer may break open any outer or inner door, or windows of a dwelling house or other building, or any other inclosure, if, after notice of his office and purpose, he be refused admittance.

Strict and rigid compliance is not required to the point where these conditions become an empty formality. These conditions are "part of a criteria of reasonableness and subject to certain exceptions . . .", *State v. Young,* 76 Wn.2d 212, 215, 455 P.2d 595 (1969), including circumstances that justify the police officer's "belief that an escape or the destruction of evidence is being attempted." *Ker,* at 47.

First, we find that the police entry was reasonable and, therefore, in substantial compliance with the constitutional and statutory requirements of the "knock and announce"

---

[7]We have assumed, without deciding, that Reid had standing to raise this argument, despite the State's contention that Reid lacked standing because he was not arrested in the apartment and he had no proprietary interest in the premises—the apartment was rented to a friend and not to Reid.

rule. The record clearly indicates that the police were uncertain as to whether the door which they unlocked and through which they entered opened into a single residence or a hallway common to several apartments. As soon as the door opened, the police loudly announced their presence and purpose. Further, even after first entering, they remained uncertain as to whether they had entered a residence or common hallway and, therefore, continued to announce their presence. Consequently, the police conduct fulfilled the purposes of the statute by reducing the risk of injury to both occupants and the police, by reducing the risk of property damage, and by protecting the occupant's right to privacy. *Coyle,* at 5.

Moreover, even if the present facts suggest less than a strict compliance with the "knock and announce" rule, we find the exigent circumstances excused any noncompliance. As discussed above, the police had a genuine concern for their safety, they had a reasonable belief that Mrs. Reid was in the apartment, the apartment was difficult to secure, and, therefore, there was a legitimate risk that Mrs. Reid would escape or attempt to destroy evidence. Hence, the entry in no way violated Mr. Reid's constitutional rights.

Because the police had a right to enter the residence to arrest (or search for) Mrs. Reid, and did so after complying with constitutional and statutory mandates, the police could have seized any incriminating evidence which they inadvertently discovered under the "plain view" doctrine. *Washington v. Chrisman,* 455 U.S. 1, 70 L. Ed. 2d 778, 102 S. Ct. 812 (1982). Having this right, they were also authorized to list in their affidavit in support of a search warrant any items observed in plain view.

We now discuss whether the warrant and execution thereof were proper. The warrant authorized the police to search Reids' house and automobile for

a shotgun, ammunition for the shotgun, a dark leather or vinyl jacket, a pillowcase or other bedlinen with a pattern of daisies, leaves, and strawberries on it, nitrates, and any other evidence of the homicide . . .

Reid contends that the "any other evidence of the homicide" language empowered the police to conduct a "general" search. We disagree.

A search warrant must describe the items to be seized with such particularity as is reasonable and practical under the circumstances. A warrant is not constitutionally defective when it limits the officers' discretion on what is to be seized. *State v. Lingo,* 32 Wn. App. 638, 641, 649 P.2d 130 (1982). The warrant here sufficiently limited the searching officers' discretion. The phrase "any other evidence of the homicide" specifically limited the warrant to the crime under investigation. The specific items listed, such as a shotgun and shotgun shells, also provided guidelines for the officers conducting the search. Therefore, these limitations were adequate to prevent a general exploratory search. *Lingo,* at 642.

While executing the warrant, the police seized two Polaroid photographs. Reid asserts that the seizure of the photographs was not authorized by the scope of the warrant because they were neither specifically described nor "evidence of the homicide."

First, we note that this question was not properly preserved for appeal. As discussed above, the trial court initially granted Reid's motion in limine to suppress both photographs. Nevertheless, at trial the State offered one of them into evidence. The only objection raised to this offer of evidence was one challenging the lack of foundation and not the propriety of its seizure. Consequently, our analysis is limited to whether there was sufficient foundation for its introduction. We conclude that there was.

Even if the scope of our review was not so limited, we would affirm the admission of the photograph.

Evidence not described in a warrant, and not constituting contraband or instrumentalities of crime, may be seized if it will aid in a particular apprehension or conviction, or it has a sufficient nexus with the crime under investigation.

*State v. Turner,* 18 Wn. App. 727, 729, 571 P.2d 955 (1977).

The photograph, which depicted Mrs. Reid holding a shotgun, had a sufficient nexus with the crime under investigation, a shotgun murder. Therefore, its seizure was proper.

■ Finally, even if the admission of the photograph and shotgun shells was erroneous, that error was harmless beyond a reasonable doubt under both the "contribution test" and the "overwhelming evidence test" discussed in *State v. Jones*, 101 Wn.2d 113, 125, 677 P.2d 131 (1984). Two eyewitnesses gave detailed descriptions of the shooting, the getaway car, and the perpetrators. The bartender testified that the victim was drinking with the female suspect prior to the murder; that at one point the female suspect told the defendant in Spanish, "Give me the car keys so I can get the shotgun ready"; that the two suspects left about one–half hour later; that the woman returned; and that immediately after luring the victim outside he heard a gunshot. The bartender also identified both the defendant and his wife at a lineup and at trial. Finally, Reid's neighbor testified that several weeks preceding the murder Reid had offered to sell him a shotgun similar to the sawed–off shotgun recovered the day after the murder. Consequently, the effect, if any, that the introduction of the shotgun shells and photograph had was so insignificant when illuminated by the overriding effect of other evidence tying Reid to the murder that, even if the admission of the evidence was error, the error was harmless beyond a reasonable doubt.

Accordingly, the judgment is affirmed.

ANDERSEN, J., concurs.

RINGOLD, J. (dissenting)—In my view, neither the warrantless seizure of Reid's keys nor the warrantless search of Reid's residence were permissible under Const. art. 1, § 7. The shotgun shells and photograph seized pursuant to the search warrant were products of this prior illegality and should have been suppressed. Because this evidence tied Reid to the murder weapon, providing a crucial link in the State's case, its admission cannot be deemed harmless

beyond a reasonable doubt. I would reverse and remand for a new trial at which this evidence would be excluded.

Article 1, section 7 of our state constitution provides: "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." In *State v. Ringer,* 100 Wn.2d 686, 674 P.2d 1240 (1983), our State Supreme Court engaged in an extensive analysis of the historical roots of this constitutional guaranty and concluded that it "poses an almost absolute bar to warrantless arrests, searches, and seizures, with only limited exceptions . . ." *Ringer,* at 690. The majority offers several reasons why the warrantless seizure of Reid's keys was permissible under article 1, section 7, none of which are persuasive.

First, contrary to the majority's suggestion, the fact that the keys were not contraband or evidence of a crime does not justify their seizure. *See Ringer,* at 699. Moreover, the majority distorts the facts in stating that police seized the keys in order to secure the automobile. The car was parked and surrounded by police cars. Reid had been arrested, handcuffed and placed in the patrol car. There is no suggestion in the record, and the State has never claimed, that the keys were seized for any other purpose than to identify and/or to gain access to the Reid residence.

The majority also concludes that the seizure of the keys was justified by exigent circumstances. The parameters of this exception to the warrant requirement were set forth in *Ringer* as follows:

> [W]here police have probable cause to conduct a search, they may do so without a warrant when "*they are confronted by emergencies and exigencies* which do not permit reasonable time and delay for a judicial officer to evaluate and act upon probable cause applications for warrants by police officers." . . . Under the doctrine of exigent circumstances, the totality of circumstances said to justify a warrantless search will be closely scrutinized. . . . The burden is on those seeking the exemption to show that the exigencies of the situation made that course imperative.
> . . .

. . . [T]he availability of a telephone warrant must . . . be considered in determining whether exigent circumstances exist.

(Citations omitted.) *Ringer,* at 701–02.

The State has not met its burden of showing that the warrantless seizure of the keys was imperative. Reid was in custody and the car was parked and secured. Police had probable cause to search the car from the time it was placed under surveillance. The State makes no showing that a telephone warrant could not have been obtained during that time or immediately following Reid's arrest. The warrantless seizure of the keys violated Const. art. 1, § 7.

Alternatively, the majority holds that if the seizure of the keys was unconstitutional, the illegality did not lead to the seizure of the photograph and shotgun shells because the police did not use the keys to identify Reid's residence. This may be a legitimate and reasonable inference from the facts,[8] but, if true, it totally undercuts the majority's reasoning that the warrantless search of Reid's residence was permissible under Const. art. 1, § 7.

If exigencies permit, police may make a warrantless search of a private residence to make an arrest or seize evidence which may be destroyed before a warrant can be obtained. Again, however, the State has failed to show that the exigencies of the situation mandated a warrantless search of Reid's residence. If, as the majority suggests, police knew from questioning neighbors which duplex unit belonged to Reid, there is nothing supporting the failure to seek a search warrant. Probable cause to obtain a search warrant existed from the time the duplex was placed under surveillance. The State makes no showing that a telephone

---

[8]Reid did not live in a large apartment complex, but in a split–level duplex. The two units had separate entrances and different street addresses, 1802 25th Avenue South and 2502 South Holgate. Reid lived at 2502 South Holgate. The police testified that they staked out 2502 South Holgate.

warrant could not have been obtained during this time.[9] The exigencies, if any, which were present following Reid's arrest were created by police inaction during surveillance. The police cannot remain idle until the situation deteriorates to the point where their failure to obtain a warrant is excused by police–created exigent circumstances. The warrantless search of Reid's residence violated Const. art. 1, § 7.

The question then presented is whether the evidence seized under the subsequently obtained search warrant must be suppressed as fruits of the poisonous tree. The police affidavit for the search warrant included the information that the female suspect was arrested inside the duplex and that ammunition was seen on the premises. Police cannot use illegally obtained information to obtain a search warrant. *State v. Moore,* 29 Wn. App. 354, 628 P.2d 522 (1981). Although probable cause existed without this information, "the existence of probable cause to search prior to an unlawful search is insufficient to sustain a subsequent search pursuant to a warrant where the affiant participated in or knew of the illegal search." *Moore,* at 360. The evidence seized under the search warrant should have been suppressed; its admission at trial was constitutional error.[10]

Harmless error is the majority's final refuge. Though constitutional error does not require reversal if the reviewing court determines it is harmless beyond a reasonable

---

[9]The sole reason given by police for failing to secure the building while a warrant was obtained was that the building was bordered on one side by blackberry bushes. This is a frivolous excuse. If the density of the vegetation prevented police from securing the building, it also would have prevented the suspect from escaping through it.

[10]The majority's reliance on the recently recognized doctrine of inevitable discovery, *Nix v. Williams,* __ U.S. __, 81 L. Ed. 2d 377, 104 S. Ct. 2501 (1984), is misplaced. It is undisputed that the police had probable cause to obtain a warrant. Application of the inevitable discovery rule under these circumstances vitiates the warrant requirement and extends the scope of the inevitable discovery rule far beyond the holding in *Nix.*

doubt, *State v. Evans,* 96 Wn.2d 1, 4, 633 P.2d 83 (1981), the methodology to be used in resolving the question of harmless constitutional error is unclear. *See State v. Vargas,* 25 Wn. App. 809, 610 P.2d 1 (1980); *State v. Evans, supra* at 6 (Brachtenbach, C.J., concurring). The courts have vacillated between two different approaches: the "contribution test" and the "overwhelming evidence test."

> Under the first approach, the appellate court looks only at the tainted evidence and asks if it might have played a part in (*i.e.,* "contributed to") the fact finder's determination of guilt. The amount and persuasiveness of the untainted evidence is not considered. If the tainted evidence could plausibly have played a part in the conviction, reversal is required.

(Citations omitted.) *Evans,* at 6–7. Under the second approach,

> [t]he appellate court examines the untainted evidence alone and finds the error harmless if the untainted evidence is so overwhelming that it *necessarily* leads to a finding of guilt. If the untainted evidence is merely *sufficient* to support the conviction, reversal is required. In effect, a conviction will be allowed to stand, although a constitutional error did, or could have, played a part in it, if there was other untainted overwhelming evidence which necessarily supported the conviction.

(Citations omitted.) *Evans,* at 7.

We have yet to choose between these approaches because resolution of the harmless error question has been the same in the cases considered by our Supreme Court, regardless of which test was used. *See State v. Johnson,* 100 Wn.2d 607, 674 P.2d 145 (1983) (harmless under either test); *State v. Belmarez,* 101 Wn.2d 212, 676 P.2d 492 (1984) (not harmless under either test). In the case sub judice, however, the choice of methodology determines the outcome. I agree with the majority that, under the overwhelming evidence test, the error in admitting the shotgun shells and photograph was harmless beyond a reasonable doubt. On the other hand, because the evidence tied Reid to the murder weapon, it "could plausibly have played a part in the con-

viction, . . ." *Evans,* at 7, and cannot be deemed harmless under the contribution test.

Although the case law can be read to support either approach, I believe it would be preferable to eliminate the overwhelming evidence test and assess harmlessness beyond a reasonable doubt by evaluating the impact of the erroneously admitted evidence. There are two important reasons why the "contribution test" is preferable:

> 1. An appellate court using the overwhelming evidence test usurps the jury's function far more significantly than an appellate court limiting its inquiry to an examination of the error.
> 2. The overwhelming evidence test disparages the notion that constitutional protection is due all citizens, the guilty as well as the innocent.

Field, *Assessing the Harmlessness of Federal Constitutional Error—A Process in Need of a Rationale,* 125 U. Pa. L. Rev. 15, 33 (1976).

The first of these reasons is by far the most significant. Any determination of harmless error requires weighing the evidence to some degree and thus, usurping the jury's function. However, the appellate court's intrusion into the fact–finding process is more limited under the contribution test.

> The crucial difference between the appellate reviews under the tests is that a court that makes a finding of harmlessness under the overwhelming evidence test is not finding that the erroneously admitted evidence did not in fact affect the verdict. It may have been the erroneously admitted evidence and not the untainted evidence that persuaded the jury of the defendant's guilt, and yet the conviction may be allowed to stand. The court's affirmance simply indicates its opinion that the untainted evidence is so overwhelming that if the jury *had* been compelled to rely on it alone, it would have convicted. In so holding, the court is not passing upon what the jury did; it is not determining the propriety of the evidence on which the jury relied. Because it is ruling instead upon what the jury would do if forced to rely on different evidence, it is substituting itself for the jury as fact–finder. Such a practice is difficult to reconcile with the accepted rule that a trial judge may not direct a ver-

dict against a defendant in a criminal case, regardless of the strength of the evidence against him.

The [contribution test] is significantly less vulnerable in this respect. Under th[is] approach, the court rules that the nature of the erroneously admitted evidence is such that it could not have affected the jury, so the jury must have relied on other (sufficient if not overwhelming) evidence in the first instance, *the same evidence it would rely on again were there a retrial.* It rules that a remand would result in a conviction of defendant on the same evidence on which he has already been convicted. This is unlike the overwhelming evidence test, under which the court denies that the error affected the verdict, but only because of its view of what the jury would do in an essentially different situation than the one that was presented to it.

(Footnote omitted.) Field, at 34–35.

The overwhelming evidence test is also inconsistent with the principle that every accused individual is constitutionally entitled to a fair trial. In effect, damaging constitutional errors are acceptable under the overwhelming evidence test, when the reviewing court determines the defendant is guilty. Under the contribution test, the reviewing court must determine whether the trial was essentially fair and that the conviction was not based on constitutional error. The contribution test also limits the possibility of recalcitrant courts evading full compliance with constitutional requirements by calling infractions harmless. *See* Field, at 35–36.

Justice Brachtenbach's scholarly and thorough analysis of the differing harmless error tests in *Evans* suggests another reason why the contribution test should be adopted as our sole test. He points out that cases in numerous jurisdictions are marked by confusing inconsistency. *Evans,* at 10. This inconsistency is due to the greater subjectivity of the overwhelming evidence test. The contribution test is more objective; we can readily apply a standard of analysis by looking only at the "tainted evidence and ask[ing] if it might have played a part in (*i.e.,* "contributed to") the fact finder's determination of guilt." *Evans,* at 6–7. "Over-

220

whelming evidence" is akin to the definition of "beauty": it depends on the eye of the beholder.

For the foregoing reasons, I would reverse and remand for a new trial.

Review denied by Supreme Court November 2, 1984.