# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| THE STATE OF WASHINGTON, | No. 77246-5-I |
| Respondent, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| SCOTT LINDSAY HALFHILL, | |
| Appellant. | FILED: December 10, 2018 |

APPELWICK, C.J. — Halfhill appeals his conviction for second degree murder. He argues that the State failed to prove intent beyond a reasonable doubt. He argues that the trial court erred by denying his motion to suppress and abused its discretion by not admitting other suspect evidence. And, he asserts that the search warrants in the case were unconstitutionally overbroad. We affirm.

## FACTS

Donald Meyer lived in a lower level, one bedroom apartment in Ballard, Washington. He sold marijuana and controlled substances out of his home. The last time his friends heard from him was on June 17, 2011.

People that knew Meyer testified that Scott Halfhill became Meyer's roommate before he disappeared. Halfhill, on the other hand, told a detective that he was not Meyer's roommate. He stated that Meyer let him store his vehicle in his driveway for two months, that he had Meyer's keys for about a week during the first part of June, and that he stayed one or two nights at Meyer's apartment.

Meyer's neighbor, Katie Blackstock, testified that it seemed like Halfhill was either sleeping in a van in Meyer's driveway or inside Meyer's apartment.

Between February 2011 and June 2011, Blackstock saw Halfhill going in and out of Meyer's apartment or heard him talking to Meyer every day. She sometimes heard what sounded like arguments between the two.

On June 17, 2011, Meyer called Katherine Marshall and left a message. Meyer also called Matthew Dehart. Dehart told Meyer he would come by the next day, June 18. When Dehart went to Meyer's apartment the next morning, Meyer did not answer his door, and his phone went to voicemail. Dehart faintly heard two people talking inside the apartment and knocked again, but left after no one answered.

On June 17, Eric Martin called Meyer and went to his door. Meyer did not answer either the phone or his door. Martin also went to Meyer's apartment around 10:00 a.m. the next day, and knocked on his door. After a few minutes, Halfhill opened the door and told Martin that Meyer was not there.

On July 6, 2011, police entered Meyer's apartment with a search warrant. Lieutenant Brian Stampfl noted that the wall in the bedroom appeared haphazardly painted and that it looked like there was something under the surface of some of the painted areas. He also noted that there appeared to be small specks of blood on the lower, unpainted portion of the wall, and a circular stain on the concrete floor. The stain appeared to be paint.

Police applied "Bluestar," a chemical that helps look for blood that cannot be seen, to the bedroom floor. The painted area of the floor reacted to the Bluestar.

2

Bluestar was also applied in the bathroom and kitchen, and showed positive results.

On July 8, 2011, Meyer's torso was found in a plastic bag at CDL Recycling in Seattle, Washington. Several months later, volunteers with Heroes for Homeless found body parts under the Ship Canal Bridge. The body parts were later identified as Meyer's. A medical examiner concluded that Meyer's cause of death was homicidal violence of unknown etiology.

On August 19, 2011, a detective interviewed Halfhill about Meyer's death. At the start of the interview, the detective informed Halfhill of his right to silence and right to counsel. Halfhill stated that he understood his rights, and participated in the interview. He was released at the end of the interview. A few weeks later, Halfhill's attorney faxed the detective Halfhill's assertion of his right to remain silent and right to counsel.

Several days later, police executed a search warrant on Halfhill's storage unit in Elma, Washington. At the unit, they found a Tic Tac box with a Velcro strip on the back. Meyer occasionally sold methadone pills, which he packaged in Tic Tac containers. He would Velcro the containers underneath his counters.

A search warrant was issued for Halfhill's DNA (deoxyribonucleic acid) on August 13, 2012. Police found him on July 8, 2013, and brought him to headquarters. After getting a new warrant for his DNA, a detective interviewed Halfhill again. The detective informed him of his right to counsel and right to remain silent. Halfhill stated that he understood his rights, and participated in the interview. He was released at the end of the interview. A few days later, Halfhill's

attorney again faxed the detective Halfhill's assertion of his right to remain silent and right to counsel.

On January 2, 2015, the State charged Halfhill with one count of murder in the second degree pursuant to RCW 9A.32.050(1)(a) and .050(1)(b). Prior to trial, he moved to suppress his July 8, 2013 statement to police. He argued that he did not waive his right to counsel when police questioned him again in 2013. At the CrR 3.5 hearing, the trial court found his statement admissible, and denied the motion. Halfhill also asked the trial court to admit other suspect evidence. In an offer of proof, he listed evidence concerning a man named Ron Varney. The trial court denied his request.

A jury found Halfhill guilty of murder in the second degree. Halfhill appeals.

DISCUSSION

Halfhill makes four arguments. First, he argues that because the State did not establish Meyer's cause of death, it did not prove an essential element of the crime—intent—beyond a reasonable doubt. Second, he argues that the trial court erred by admitting his July 2013 statement to police into evidence, because he invoked his right to silence and right to counsel. Third, he argues that the trial court erred by not allowing him to present evidence suggesting that another person killed Meyer. Fourth, in a statement of additional grounds for review, he argues that every search warrant in the case that described the items to be seized as "evidence of the crime of Murder" was unconstitutionally overbroad.

I.  Sufficiency of Evidence

Halfhill argues that the State did not prove how Meyer died, and therefore failed to establish that his death was the result of an intentional act.  He argues that to prove second degree murder, the State was required to prove that Meyer died as a result of Halfhill's intentional acts.  He states that the fact that Meyer's body was dismembered and concealed is not sufficient to prove he died as a result of an intentionally violent act, and any other evidence of intent was speculative and equivocal.

The sufficiency of the evidence is a question of constitutional law that this court reviews de novo.  State v. Rich, 184 Wn.2d 897, 903, 365 P.3d 746 (2016).  Evidence is sufficient to support a conviction if, viewed in the light most favorable to the prosecution, it permits any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt.  State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).  "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom."  Id. Circumstantial and direct evidence are equally reliable.  State v. Delmarter, 94 Wn.2d 634, 638, 618 P.2d 99 (1980).  A defendant's criminal intent "may be inferred from circumstantial evidence . . . or from conduct, where the intent is plainly indicated as a matter of logical probability."  State v. Billups, 62 Wn. App. 122, 126, 813 P.2d 149 (1991).  We defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence.  State v. Walton, 64 Wn. App. 410, 415-16, 824 P.2d 533 (1992), abrogated on other

grounds by In re Pers. Restraint of Cross, 180 Wn.2d 664, 681 n.8, 327 P.3d 660 (2014).

The State charged Halfhill with murder in the second degree under two alternative means: (1) intentional murder under RCW 9A.32.050(1)(a), and (2) felony murder by assault in the second degree under RCW 9A.32.050(1)(b). The jury instructions[1] provided that "[a] person commits the crime of Murder in the Second Degree when with intent to cause the death of another person but without premeditation, he or she causes the death of such person or of a third person." In the alternative, the instructions provided,

> A person commits the crime of Murder in the Second Degree when he or she commits or attempts to commit assault in the second degree and in the course of and in furtherance of such crime or in immediate flight from such crime he or she causes the death of a person other than one of the participants.

The instructions defined assault in the second degree as "intentionally assault[ing] another and thereby recklessly inflict[ing] substantial bodily harm or assault[ing] another with a deadly weapon or assault[ing] another with intent to commit a felony or assault[ing] another by strangulation or assault[ing] another by suffocation."

Halfhill argues that the fact that Meyer's body was dismembered does not alone establish that he died as a result of an intentionally violent act. He does not cite authority to support his argument that the State must prove how a victim died in order to prove beyond a reasonable doubt that the victim died from an intentional

---

[1] Jury instructions not objected to become the law of the case. State v. Hickman, 135 Wn.2d 97, 102, 954 P.2d 900 (1998).

act. Instead, he relies on State v. Hummel, 196 Wn. App. 329, 383 P.3d 592 (2016).

A jury convicted Hummel of premeditated murder in the first degree of his spouse, Alice. Id. at 331. This court found that, even if the evidence supported an inference that a confrontation between Hummel and Alice occurred, there was no evidence to show deliberation or reflection before Hummel killed Alice. Id. at 356. It reasoned that evidence that Hummel disposed of her body, concealed her death, and fraudulently obtained her disability checks after she died may be evidence of guilt, but not premeditation. Id. at 356-57. Accordingly, this court held that no reasonable trier of fact could have found beyond a reasonable doubt that Hummel killed Alice with premeditated intent. Id. at 358-59.

Halfhill argues that, similarly here, the fact that Meyer's body was dismembered and concealed may be evidence of guilt, but does not establish intent. He states that Meyer could have died as the result of an unintentional, but still criminal, act. But, unlike Hummel, premeditation is not the element at issue. The court there did not say the evidence did not prove intent, only that it did not prove premeditated intent. Id.

A defendant's criminal intent may be inferred from circumstantial evidence "where the intent is plainly indicated as a matter of logical probability." Billups, 62 Wn. App. at 126. And, the evidence that Meyer's body was dismembered and concealed was not the only circumstantial evidence of intent presented at trial. Meyer's torso was found at CDL Recycling on July 8, 2011. It was traced back to

a recycling bin from a house demolition site in Ballard. The demolition site was less than a half block from Meyer's residence.

Other body parts of Meyer's were discovered in the Eastlake neighborhood under the Ship Canal Bridge in December 2011. On August 10, 2011, Halfhill's van was towed from Eastlake Avenue East. At trial, the medical examiner testified that the type of force required to cause the injuries to Meyer's facial bones was "blunt force." She also testified that the damage to his facial bones took place perimortem, or around the time of death.

Meyer's DNA was matched to blood discovered on the wall in his bedroom. Halfhill's DNA was matched to blood discovered in Meyer's hallway, and on a cooler in Meyer's closet. When people entered Meyer's apartment the week after he disappeared, they saw that the carpet in the bedroom had been torn out, and the bedroom walls were freshly painted. Halfhill later told a detective that he had helped Meyer pull up the carpet and paint the walls in his bedroom.

The last time Meyer's friends heard from him was on June 17, 2011. On June 18, 2011, Halfhill answered Meyer's door and told Martin that Meyer was "'probably not going to make it.'" Halfhill later told a detective that he last saw Meyer on June 19, 2011. This was two days after Meyer's friends last heard from him, and a day after Halfhill answered Meyer's door and told Martin that Meyer was probably not going to make it.

Before Meyer disappeared, his neighbor, Blackstock, saw Halfhill come and go from Meyer's apartment, or heard the two talking, almost every day. She could sometimes hear Halfhill and Meyer arguing. Meyer's neighbor Molly Chesney

testified that she once heard Halfhill tell Meyer that "nobody was going to F [sic] with him." She also heard a taser go off at that time. Blackstock had seen Halfhill sitting in his van, playing with a Taser.

Meyer's DNA was found on a Tic Tac box with a Velcro strip on the back at Halfhill's storage unit. Meyer used Tic Tac containers to package methadone pills. He would Velcro little containers underneath his counters. After Meyer disappeared, Martin checked all of Meyer's "hiding places," where he hid things like marijuana and methadone pills, and everything was gone.

Viewing this evidence in a light most favorable to the State, a reasonable jury could find that Halfhill intended to either assault or kill Meyer, resulting in his death. Therefore, the evidence was sufficient to support Meyer's conviction for murder in the second degree.

II.   Custodial Statement

Halfhill argues that in July 2013, police did not scrupulously honor his request not to be questioned without an attorney present. He asserts that after he was interrogated in August 2011, his attorney faxed a written document to police that unequivocally invoked his rights to be silent and have an attorney present during further questioning. He states that at the beginning of his second interrogation in 2013, he explicitly referred to that earlier invocation of rights, thereby ratifying and reaffirming its contents. Because police did not cease interrogating him at that time, he argues that his resulting statement was admitted in violation of the Fifth Amendment.

This court reviews de novo a trial court's conclusions of law at a suppression hearing. State v. Armenta, 134 Wn.2d 1, 9, 948 P.2d 1280 (1997). The Fifth Amendment privilege against compelled self-incrimination requires that custodial interrogation be preceded by advice to the accused that he has a right to remain silent and a right to counsel. Miranda v. Arizona, 384 U.S. 436, 478-79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). The accused may waive his Miranda rights, so long as the waiver is knowing and intelligent. Id. at 475. If the accused invokes his right to counsel, interrogation must cease. Id. at 473-74. Police may not then resume interrogation until an attorney is present or the accused initiates further communication. Edwards v. Arizona, 451 U.S. 477, 484-85, 101 S. Ct. 1880, 68 L. Ed. 2d 378 (1981). If officers continue interrogation after the accused invokes his right to counsel, all resulting statements must be suppressed. See id. at 486-87.

But, in Maryland v. Shatzer, the United States Supreme Court held that the Edwards rule does not apply to a break in custody lasting 14 days or more. 559 U.S. 98, 110, 130 S. Ct. 1213, 175 L. Ed. 2d 1045 (2010). It reasoned that 14 days provides plenty of time for the suspect to get reacclimated to normal life, consult with friends and counsel, and shake off any residual coercive effects of the prior custody. Id. More than 14 days passed between Halfhill's 2011 and 2013 interrogations. Accordingly, if Halfhill did not invoke his Miranda rights again in 2013, the Edwards rule does not apply.

Relying on United States v. Santistevan, 701 F.3d 1289 (10th Cir. 2012), Halfhill argues that he invoked his Miranda rights during his second interrogation

when he specifically referred to his earlier invocation of rights. Santistevan was a suspect in a series of robberies, and had turned himself in to police on unrelated charges. Id. at 1290. A Federal Bureau of Investigation agent investigating the robberies advised him of his Miranda rights and asked if he wanted to speak about the robberies. Id. Santistevan declined. Id. Six days later, Santistevan's girlfriend told the agent that Santistevan wanted to speak with him. Id. On the way to interviewing Santistevan at the jail, the agent received a call from Santistevan's attorney. Id. at 1291. She stated that Santistevan did not wish to speak with him, and that she had given him a letter to give to the agent. Id. at 1291.

At the jail, the agent asked Santistevan if he had the letter. Id. Santistevan handed him a letter from his attorney, which stated that he did not wish to speak to the agent without counsel. Id. The agent still asked Santistevan if he wanted to speak with him, and Santistevan said, "Yes." Id. The agent then advised him of his Miranda rights. Id. The Tenth Circuit determined that Santistevan himself, not his attorney, "told the agent that he did not wish to speak when he gave the letter to the agent and adopted its contents." Id. at 1293. Accordingly, it held that "this clear act invoked Mr. Santistevan's right to counsel." Id.

After being advised of his Miranda rights on July 8, 2013, Halfhill stated that he did not know there was a warrant for his DNA. He then stated, "So, if I would've known I would['ve] cleared that because Paul Vernon should have been in touch with me. He contacted you through the Defender's association. They sent you some stuff over." On September 13, 2011, Halfhill's attorney, Vernon, had faxed the detective Halfhill's assertion of his right to silence and right to counsel. After

11

stating that his attorney had sent the detective "some stuff" two years ago, Halfhill stated that his attorney had never contacted him, and he did not know anything about the warrant.

Unlike Santistevan, Halfhill did not hand the detective a letter stating that he did not wish to speak without his attorney present. And, he did not restate or adopt the fax's contents in some other way. Instead, he stated that his attorney should have been in touch with him, that his attorney had sent the detective "some stuff" two years prior, and that he did not know about the DNA warrant. Halfhill did not invoke his right to counsel through these statements.

Because more than 14 days had passed since Halfhill was last questioned on August 19, 2011, the Edwards rule does not apply. And, he did not state that he did not want to talk to the officers nor did he invoke his right to counsel. Accordingly, Halfhill's July 8, 2013 custodial statement was admissible.

III.    Other Suspect Evidence

Halfhill argues that the trial court abused its discretion by refusing to allow him to "present probative evidence suggesting that another person killed Meyer." He asserts that the evidence in his offer of proof "tended to connect Varney with Meyer's death." He states that Varney had the motive and opportunity to commit the crime, and that Varney made statements suggesting he knew about the crime and was somehow involved.

Under the Sixth Amendment of the United States Constitution and article I, section 22 (amendment 10) of the Washington Constitution, a criminal defendant has a constitutional right to present a defense. State v. Maupin, 128 Wn.2d 918,

924, 913 P.2d 808 (1996). But, the right to present a defense is not absolute. State v. Jones, 168 Wn.2d 713, 720, 230 P.3d 576 (2010). This right "does not extend to irrelevant or inadmissible evidence." State v. Wade, 186 Wn. App. 749, 764, 346 P.3d 838 (2015).

This court reviews a trial court's decision to exclude evidence for abuse of discretion. See State v. Quaale, 182 Wn.2d 191, 196, 340 P.3d 213 (2014). In order to present evidence suggesting another suspect committed the charged offense, the defendant must show "'such a train of facts or circumstances as tend clearly to point out some one besides the prisoner as the guilty party.'" State v. Downs, 168 Wash. 664, 667, 13 P.2d 1 (1932) (quoting Greenfield v. New York, 85 N.Y. 75, 89 (1881)). In other words, "some combination of facts or circumstances must point to a nonspeculative link between the other suspect and the charged crime." State v. Franklin, 180 Wn.2d 371, 381, 325 P.3d 159 (2014). "Mere evidence of motive in another party, or motive coupled with threats of such other person, is inadmissible, unless coupled with other evidence tending to connect such other person with the actual commission of the crime charged." State v. Kwan, 174 Wash. 528, 533, 25 P.2d 104 (1933). The evidence must show "some step taken by the third party that indicates an intention to act" on the motive or opportunity. State v. Rehak, 67 Wn. App. 157, 163, 834 P.2d 651 (1992). The defendant must lay a foundation establishing a clear nexus between the other person and the crime. State v. Condon, 72 Wn. App. 638, 647, 865 P.2d 521 (1993). The defendant bears the burden of showing that the other suspect

evidence is admissible. See State v. Pacheco, 107 Wn.2d 59, 67, 726 P.2d 981 (1986).

Halfhill's proffered evidence relates to Varney's[2] attempt to sell Meyer morphine pills, Varney's violent tendencies, and statements Varney made regarding Meyer and saws. Halfhill stated that Varney "expressed significant disappointment, anger and hostility" when a deal to sell morphine pills to Meyer did not go through. He stated that Martin Holloway, a friend of Meyer's and a former employer of Varney's, introduced Varney to Meyer, and the two bought and sold drugs from one another.

In his offer of proof, Halfhill stated that Holloway would testify that Meyer called him to ask if he could trust Varney, and that Varney met up with Meyer sometime between June 9 and June 17. Holloway was aware that Varney had violent tendencies, and told defense counsel that out on a paint job one day, Varney said, "'[Y]ou will never see him again,'" referencing Meyer. Holloway also told defense counsel that Varney told him Meyer would be easy to mug. Varney made these statements before Holloway learned Meyer was missing. After learning of Meyer's death, Varney told Holloway he had a sword. When Holloway asked Varney how you cut someone up with a sword, Varney told him that "you use saws to cut people up."[3]

---

[2] Varney is now deceased.

[3] Halfhill also stated that Susan Felton, Varney's neighbor, was witness to the discussions about Varney selling morphine pills to Meyer. He stated that Varney told Felton "information indicating he may be involved in the death of a man whose partial body was discovered on July 8th, 2011 at CDL Recycle in Seattle." And, he stated that Felton said she was in possession of an e-mail from Varney

The trial court found that nothing in the proffered evidence placed Varney in close proximity to the crime. Specifically, it stated that "Varney is absent in that June 17th to June 18th period."[4] It further stated that it would not indulge in the "speculative leap" that Varney's statement, "'You are never going to see him again,'" meant, "'I killed him.'" And, it explained that Varney may have violent tendencies, but there is nothing indicating that they were directed towards Meyer. It stated that there are no facts showing what violent tendencies Varney had, other than Holloway's conclusory statement that Varney was violent. Accordingly, it denied Meyer's request to admit the proffered evidence.

Halfhill argues that the proffered evidence is admissible because, if believed by the jury, it would establish that Varney had the motive, opportunity, and character to commit the crime. He relies on State v. Ortuno-Perez, 196 Wn. App. 771, 385 P.3d 218 (2016) and Franklin.

In Ortuno-Perez, the defendant was convicted of murder in the second degree for shooting the victim in the head while the victim was standing outside of his house. 196 Wn. App. at 774-75. When the shot was fired, between 5 to 12 people were standing in close proximity to the victim. Id. at 776. That group included Agnish, who was armed with a handgun. Id. Ortuno-Perez had sought to introduce evidence that Agnish was the shooter, but the trial court denied his request because he had not demonstrated that Agnish took steps to commit the

_____

providing additional detail. However, the information indicating he may be involved in the death and the contents of the e-mail are not in Halfhill's offer of proof.

[4] Halfhill's proffered evidence did not establish that Varney was absent during this period. Rather, in the offer of proof, Halfhill stated that Holloway would testify that Varney met up with Meyer sometime between June 9 and June 17.

15

crime. Id. at 776-77. This court disagreed. Id. at 791. It found that the proffered evidence "was of a type that tended to logically connect Agnish" to the victim's murder. Id. It stated that if credited by the jury, the evidence would establish "Agnish's motive (a gang clash), his opportunity (he was present at the murder scene and in close proximity to Castro at the instant of the shooting), and his means (he was armed with a handgun)." Id.

In Franklin, the trial court excluded the defendant's proffered evidence that his live-in girlfriend, Hibbler, committed the cyberstalking crimes with which he was charged. 180 Wn.2d at 372. Franklin's proffered evidence included that Hibbler's personal laptop was the only computer in their home, and she had previously sent threatening messages to the victim via e-mail, text message, and phone, expressing displeasure about the victim's relationship with Franklin. Id. at 376. Hibbler had also accessed Franklin's e-mail in the past. Id. The State Supreme Court reversed the trial court's decision, stating that the trial court was incorrect to suggest that direct, rather than circumstantial, evidence was required. Id. at 381, 383. It explained that the standard for relevance of other suspect evidence is whether there is evidence tending to connect someone other than the defendant with the crime. Id. at 381. Taken together, it found that the excluded evidence amounted to a chain of circumstances tending to create reasonable doubt as to Franklin's guilt. Id. at 382.

Here, Halfhill's proffered evidence may suggest that Varney had the motive to commit the crime, because his deal to sell morphine pills to Meyer did not go through. But, even if credited by the jury, the proffered evidence does not establish

16

that Varney had the opportunity or the means to commit the crime. Unlike Ortuno-Perez and Franklin, the evidence does not place Varney in close proximity to the crime. The last time Meyer's friends heard from him was on June 17, 2011. Meyer called and left a message for Marshall, and spoke with Dehart on the phone. The offer of proof alleged that Holloway was aware that Varney met up with Meyer sometime between June 9 and June 17. But, Meyer was alive during that period of time. And, the evidence does not establish whether Varney's "violent tendencies" were ever directed at Meyer.[5] Taken together, the evidence does not tend to logically connect Varney to Meyer's murder.

IV.    Statement of Additional Grounds for Review

In his statement of additional grounds, Halfhill argues that every search warrant that describes the items to be seized as "'evidence of the crime of Murder'" is unconstitutionally overbroad, because murder under the Washington statutes can be committed by different means. He asserts that by neglecting to cite the specific statute and its component subsection, all the warrants in this case authorized the seizure of items for which there was no probable cause.

Halfhill did not raise this overbreadth claim to the trial court. We generally do not review claims raised for the first time on appeal absent a showing of manifest error affecting a constitutional right. RAP 2.5(a); State v. McFarland, 127 Wn.2d 322, 332-33, 899 P.2d 1251 (1995). But, we need not reach this threshold question. Even if Halfhill had preserved the claim, it would fail.

---

[5] The example Holloway gave of Varney's violent tendencies was that on one occasion, Varney threatened to kill Holloway while chasing and assaulting him with a knife.

17

The Fourth Amendment requires that search warrants particularly describe the place to be searched and the persons or things to be seized. U.S. CONST. amend. IV. Warrants must enable the searcher to reasonably ascertain and identify the things that are authorized to be seized. State v. Besola, 184 Wn.2d 605, 610, 359 P.3d 799 (2015). This court evaluates search warrants in a common sense, practical manner, rather than using a hypertechnical standard. State v. Stenson, 132 Wn.2d 668, 692, 940 P.2d 1239 (1997).

The warrant authorizing police to search Halfhill's storage unit, is the only search warrant in the record.[6] The warrant authorized them to search and seize evidence of the crime of murder, including "tools, saws, cleaning/painting supplies, cell phones, computers, written documents in any form, weapons or weapon paraphernalia, forensic and trace evidence including but not limited to, biological fluids, hairs, fibers, body parts and latent prints, papers of dominion and control, and any items linking Halfhill to Meyer."

Halfhill states that the warrants in this case did not use the language of the statutes or cite the statutes and their subsections. He reasons that the warrants were therefore not limited in their search for evidence, which "is not sufficient" under State v. Higgins, 136 Wn. App. 87, 147 P.3d 649 (2006). In Higgins, an officer obtained a search warrant authorizing seizure of "'certain evidence of a crime, to-wit: 'Assault 2nd DV' RCW 9A.36.021.'" Id. at 90. The warrant did not

---

[6] The transcript of the telephonic hearing where Judge Kessler authorized the detective to obtain Halfhill's DNA is in the record, but the search warrant is not. In the transcript, Judge Kessler found probable cause to search Halfhill's DNA, and authorized the detective to sign his name to the search warrant.

contain a list of the items to be seized, did not incorporate the affidavit describing the items to be seized, and did not list a subsection of the second degree assault statute. Id. This court held that the warrant was overbroad on several grounds, including its failure to specify the particular crime in question, RCW 9A.36.021(1)(c). Id. at 89-90. It also distinguished the case from State v. Reid, 38 Wn. App. 203, 687 P.2d 861 (1984). Higgins, 136 Wn. App. at 94.

In Reid, a search warrant authorized police to search the defendant's house and automobile for "'a shotgun, ammunition for the shotgun, a dark leather or vinyl jacket, a pillowcase or other bedlinen with a pattern of daisies, leaves, and strawberries on it, nitrates, and any other evidence of the homicide.'" 38 Wn. App. at 211 (emphasis added). Reid had been charged with first degree murder. Id. at 206. He argued that the "'any other evidence of the homicide'" language empowered police to conduct a general search. Id. at 212. This court disagreed. Id. It found that the phrase "'any other evidence of the homicide'" specifically limited the warrant to the crime under investigation. Id. It also found that the specific items listed provided guidelines for the officers conducting the search. Id. Accordingly, it held that "these limitations were adequate to prevent a general exploratory search." Id.

The search warrant here did not include the specific statute and subsections Halfhill was charged under. But, unlike Higgins, it contained a list of the items to be seized. And, similar to Reid, the phrase "evidence of the crime of murder" specifically limited the warrant to the crime under investigation. The specific items listed also provided guidelines for the officers conducting the search. These

limitations were adequate to prevent a general exploratory search. Therefore, the warrant was not unconstitutionally overbroad.

We affirm.

Appelwick, C.J.

WE CONCUR:

Smith, Jr.

Verellen, J.